**FROST–BENCO ELECTRIC
ASSOCIATION,
Respondent,**

v.

**MINNESOTA PUBLIC UTILITIES
COMMISSION, Petitioner,**

**Minnesota Department of Public
Service, intervenor, Petitioner.**

**No. CX–83–1591.**

Supreme Court of Minnesota.

Nov. 30, 1984.

Hubert H. Humphrey, III, Atty. Gen., Craig R. Anderson, Asst. Atty. Gen., St. Paul, for Dept. of Public Service.

Karl W. Sonneman, Asst. Atty. Gen., St. Paul, for Minn. Public Utilities Com'n.

John C. Hottinger, M. John Gustavson, Mankato, for Frost-Benco Elec. Ass'n.

Harold LeVander, Jr., So. St. Paul, for amicus curiae Rural Elec. Ass'n.

Clayton L. LeFevere, Minneapolis, for amicus curiae Co-op. Power Ass'n.

KELLEY, Justice.

Appellant Frost-Benco Electric Association (Frost-Benco), an electric cooperative, made application to the Minnesota Public Utilities Commission (MPUC) for approval of increased electrical rates. Following evidentiary hearings a hearing examiner issued his report.[1] The MPUC subsequently issued its order which required, *inter alia,* that Frost-Benco refund to its membership the difference between purchased power revenues collected by Frost-Benco during the test year (July 1, 1980 through June 30, 1981), at which time Frost-Benco was not subject to MPUC regulation, and the actual purchased power expenses paid by Frost-Benco to its power suppliers during the same period. On appeal to the Blue Earth County District Court, the MPUC's order was affirmed. The basic issue on this appeal is whether the MPUC has jurisdiction to regulate a utility by ordering refunds of amounts collected by a utility during the period of non-regulation. We hold that it does not and reverse.

Frost-Benco is a cooperative electric association organized under the provisions of Minn.Stat. ch. 308 (1982). The cooperative provides retail electrical service to approximately 8,000 customers in south-central Minnesota. The company was formed on January 1, 1980 through a consolidation of the Blue Earth-Nicollet Cooperative Electric Association and the Faribault County Electric Association.

Frost-Benco generates no electricity of its own. Instead, it purchases all of its energy requirements at wholesale from Cooperative Power Association, a generation and transmission cooperative owned collectively by 18 cooperative associations including Frost-Benco. Thus, Frost-Benco operates solely to distribute electricity.

---

1. In this proceeding petitions of intervention were filed by the Minnesota Department of Pub-   lic Service (MDPS) which is a party to this appeal and by two others who are not.

As a cooperative, Frost-Benco does not engage in the traditional method of raising capital through public offerings of common stock. Rather, Frost-Benco raises a small portion of its equity capital through a nominal, one-time membership charge to each member-ratepayer. The majority of Frost-Benco's equity capital is raised through the retention of monies paid for electricity by members in excess of the cost of providing such electricity. These excess "margins" are rotated, or returned to the members in a fixed cycle of 15 years.

Like most retail cooperatives, Frost-Benco accounts separately for the cost of energy it must purchase. These wholesale power costs are further broken down into a base component and a fluctuating adjustment known as a power cost adjustment (PCA). The latter adjustment, which is directly involved in this case, represents the degree to which energy costs have changed since the base component was originally set. During the evidentiary hearing in this case a witness described the purpose of the PCA as follows:

> [T]he function of the PCA is to match the cost of purchased power with the revenue from consumers so the changes in the cost of purchased power are adequately and promptly reflected in the rates. The function of the PCA is not to adjust margin based on previous losses or even target margins.

The original intention for use of a PCA was to allow utilities to pass on to consumers additional power costs without having to file a general rate case.

When Frost-Benco was formed, it prepared rate schedules for electric sales including base rates designed to recover the current cost of purchased power. In spite of a wholesale rate increase from Cooperative Power in January 1980, Frost-Benco did not add a PCA to the base rates just established. Thus, Frost-Benco absorbed the January increase as well as a second increase in May 1980. Frost-Benco did not add a PCA to its base rates until July 1, 1980. On that date, Frost-Benco implemented an annual PCA increase of 1.47 cents per kwh. Frost-Benco determined this figure would recoup the costs absorbed and would recover the cost of power for the next 6 months. Accordingly, Frost-Benco designed the new PCA with the aim of breaking even by the end of the year.

Figured into the projected costs was an anticipated wholesale cost increase due to Cooperative Power's contemplated start-up of a new power plant known as Coal Creek Unit No. 2. Notices of the new PCA stated that, "[t]he reason for this increase is that we must begin paying for Unit No. 2 of the Coal Creek generating station." Coal Creek Unit No. 2, however, did not begin generating electricity until July 1981. Despite this fact, Frost-Benco's PCA still collected $50,000 less than the actual cost of purchased power for the calendar year 1980.

Frost-Benco continued, in 1981, to charge its members the 1.47 PCA, even though the company recognized that that figure was too high. Frost-Benco's management decided that the current figure was justified because Cooperative Power was due to change its wholesale rates in May 1981. Moreover, neither Frost-Benco nor its members desired electric bills that fluctuated widely from month to month.

The PCA remained in force until June 1, 1981. On June 1, 1981, Frost-Benco became subject to MPUC regulation following an election pursuant to Minn.Stat. § 216B.02, subd. 4 (1982).[2] Upon becoming regulated, Frost-Benco reduced its PCA to 0.5 cents per kwh in conformance with the 2-month moving average formula required by the MPUC's rules. As a result of the earlier PCA miscalculation, however, Frost-Benco's revenue collections for the period July 1, 1980 through June 30, 1981 exceeded its wholesale power costs by approximately $478,791.

---

**2.** At present, two distribution cooperatives are subject to the rate jurisdiction of the MPUC and 46 distribution cooperatives are not.

Shortly after becoming regulated, Frost-Benco realized that it needed a general rate increase to provide adequate margins. For purposes of MPUC review of Frost-Benco's future revenue requirements, Frost-Benco personnel selected the period of July 1, 1980 to June 30, 1981 as a test year. Both the MPUC and Frost-Benco agreed that a fair rate of return was 8.12%. A discrepancy arose, however, as to how to handle the erroneous PCA computation. Frost-Benco argued that because of the change to a statutory method of computing the PCA, its $497,260 revenue decrease in the test year data was appropriate. MPUC and MDPS proposed that the MPUC either direct Frost-Benco to refund the PCA "overcharges" or reinstate these "overcharges" in the test year data.

The hearing examiner agreed conceptually with the MPUC/MDPS position. Using his own method of computation, the examiner recommended an upward adjustment in Frost-Benco's test year revenues of ·approximately $300,842.

On October 22, 1982, the MPUC modified the examiner's recommendation. The MPUC agreed with Frost-Benco that the revenue base to be employed in setting Frost-Benco's permanent rates should reflect Frost-Benco's adjustment. The MPUC found, however, that a one-time refund of the "erroneous PCA collections" during the test year was necessary. Subject to other minor rate differences, the MPUC approved Frost-Benco's request for an 8.12% rate increase.[3]

■■■■■ On appeal from the MPUC this court may reverse the decision of the agen-cy on, among other grounds, its decision is "in excess of the statutory authority or jurisdiction of the agency" see Minn.Stat. § 14.69(b) (1982). Inasmuch as the major issue on this appeal is whether the MPUC has authority and jurisdiction over an unregulated cooperative utility, the resolution of the issue concerns legal rather than factual considerations. Thus, the court is not bound by the decision of the MPUC and need not defer to "agency expertise". *No Power Line, Inc. v. Minnesota Environmental Quality Council,* 262 N.W.2d 312, 320 (Minn.1977). Moreover, an appellate court need not give deference to a trial court's decision on a legal issue. *Reserve Mining Co. v. Herbst,* 256 N.W.2d 808, 822 (Minn.1977).

■■■■ By ordering Frost-Benco to refund rates collected while it was an unregulated cooperative, the MPUC, unless it has statutory authority to do so, conferred upon itself a broad retroactive jurisdiction. The extent of jurisdiction or authority bestowed upon an administrative agency is measured by the statute from which it derives its authority. *McKee v. County of Ramsey,* 310 Minn. 192, 195, 245 N.W.2d 460, 462 (1976). Authority is not obtained by the agency's own acts or by its assumption of authority.

The statutory authority of the MPUC is found in Minn.Stat. ch. 216B (1982). This chapter provides the MPUC with broad regulatory power over public utilities. Minn. Stat. § 216B.01 (1982). When chapter 216B was originally enacted in 1974, cooperative associations like Frost-Benco were included in the definition of public utilities.

---

**3.** Throughout this litigation, the MPUC and the MDPS characterize the erroneous PCA collections by Frost-Benco as an overcollection. This characterization, however, is misleading. No one argues that the total revenues of Frost-Benco in the test year were excessive. Nowhere in the transcript or the briefs is there a contention that Frost-Benco's member-ratepayers paid too much. Rather, it is quite clear that Frost-Benco could have collected the excess PCA as an increased base rate. In fact, Frost-Benco's rate of return for the test year was 6.19 percent—approximately 2 percent less than the rate of return it might have received if it had been regu-lated at the time. Requiring Frost-Benco to refund the erroneous PCA revenues would reduce Frost-Benco's rate of return to 1.10 percent. This percentage, in turn, when inserted into another formula yields a figure precariously close to the default level established in mortgage and security agreements with the Rural Electrification Administration and the National Rural Utilities Cooperative Finance Corporation. Frost-Benco merely collected monies it was entitled to, but it collected these monies under a PCA figure asserted to be inappropriate in these circumstances.

*See Taylor v. Beltrami Electric Cooperative, Inc.*, 319 N.W.2d 52, 55 (Minn.1982). In 1978, however, the legislature removed cooperatives from the ratemaking authority of the MPUC. Act April 7, 1978, ch. 795, 1978 Minn.Laws 1220. In support of the exclusion of cooperative electric associations from the definition of public utilities subject to regulation by the MPUC, the legislature found:

It is hereby declared to be in the public interest that public utilities be regulated as hereinafter provided * * *. Because * * * cooperative electric associations are presently effectively regulated and controlled by the membership under the provisions of chapter 308, it is deemed unnecessary to subject such utilities to regulation under this chapter except as specifically provided herein.

Minn.Stat. § 216B.01 (1982). After adoption of this amendment, cooperative rate regulation could occur only upon an election by the cooperative's member-ratepayers to become regulated. Minn.Stat. § 216B.026, subd. 1 (1982). *Cf.* Minn.Stat. § 216B.17, subd. 6a (1982); Minn.Stat. § 216B.027 (Supp.1983).

█ This court recognized this principle in *Beltrami* when it commented directly on the ratesetting power of the MPUC with respect to cooperatives, stating:

The legislative history indicates that the 1978 amendments were intended to reduce unnecessary bureaucracy in ratesetting by cooperatives. The statutory scheme is designed to exempt from state regulation those activities of a cooperative which the members can control by themselves. A cooperative need not be subject to the Commission in setting rates because the membership through its voting power can effectively review and modify the proposal and because the members of the cooperative are the ultimate recipients of any profit made.

*Beltrami*, 319 N.W.2d at 55 (footnote omitted). Therefore, from the effective date of deregulation until the effective date of an election to become regulated, an electrical cooperative's rates are within the exclusive

control of its member-ratepayers and its board of directors.

█ In this case, a review of the important dates and time periods demonstrates that the MPUC possessed no authority to regulate Frost-Benco's rates by means of a refund: 1) On April 8, 1978, Frost-Benco, along with all electric cooperatives, became unregulated; 2) the alleged overcollection occurred between July 1, 1980 and May 30, 1981; 3) on June 1, 1981, Frost-Benco's election to become subject to MPUC regulation became effective and Frost-Benco adopted the MPUC's PCA formula.

█ The MPUC and the MDPS claim that because Frost-Benco personnel selected the test-year period, Frost-Benco subjected its activities for that period to the MPUC's regulatory jurisdiction. The test year, however, is merely an informational construct. The test year is a representative 12-month period from the past submitted to the MPUC in order to enable the regulators to make an accurate prediction of the utility's needs in the future. *See* Minn.Reg. PSC 400(P), *recodified at,* Minn. Rule 7825.3100, subp. 17 (1983). In *Northwestern Bell Telephone Co. v. State*, 253 N.W.2d 815, 822 (Minn.1977), we summarized the test-year concept, stating:

The test year concept is designed to produce a measure of a regulated utility's earnings for a known period of time, to enable the regulatory body to make an accurate prediction of revenues and expenses in the reasonably near future. Based upon the evidence presented, the regulatory body undertakes a reasoned exercise of its discretion in altering test-year data to reflect changes of known magnitude occurring subsequent to the test year.

A test year merely enables the regulatory body to predict anticipated revenues and expenses in the future. It does not mean that submission of data for the test year by the utility thereby grants to the MPUC authority to exercise regulation of a non-regulated utility during that test year by ordering it to refund to its ratepayers revenues collected by it during the period of

nonregulation. The MPUC and the MDPS assert that to "conclude now that the commission cannot review and adjust Frost-Benco's test year financial data in prescribing [Frost-Benco's] rates would leave Frost-Benco's members without a remedy for [Frost-Benco's] PCA overcollection during the test year." To so decide, the agencies argue, would be contrary to Minn. Const. Art. I, § 8, which provides that every person is entitled to a remedy in the law for all injuries or wrongs. Such an argument in this case, however, begs the question. First, as noted above, the MPUC has no statutory power to reach back and regulate the actions of Frost-Benco during a period of non-regulation. The adjudication of any alleged wrongs could not be referred to the MPUC, except by statutory enactment. Moreover, any rates collected in excess of the cooperative's actual expenses must be credited to the members' accounts in accordance with Frost-Benco's articles of incorporation and bylaws. Finally, if wrongs in fact occurred, the proper forum for a member-initiated action is a court of law or equity.[4]

■ Because Frost-Benco was unregulated at the time it set the rates in question, its rates were lawful. There was no regulatory power other than its own cooperative articles and bylaws and its patrons' dissatisfaction prohibiting it from imposing a dramatic increase in its rates. Thus, there is little merit to the MPUC's contention that Frost-Benco rules were unlawfully established. That being so, by ordering the refund the MPUC was engaging in rate regulation.

Having concluded that the MPUC had no jurisdiction to set rates[5] for Frost-Benco during a time when the latter was unregulated and that there exists no statutory authority for the MPUC to indirectly regu-

late past rates by ordering the refund, it is unnecessary to consider appellant's other arguments that the MPUC's refund decision was unsupported by substantial evidence or that it was arbitrary, unreasonable, or capricious.

Reversed.

---

4. Without citing any authority the district court would justify the MPUC's order by holding that as of June 1, 1981, the MPUC gained jurisdiction over the "unspent fruits" of any improper collection of funds by Frost-Benco. That contention must be rejected. It is beyond the court's power to confer jurisdiction on an administrative agency; only the legislature can confer jurisdiction.

5. In a recent decision involving another regulated corporation, the MPUC encouraged the cooperative to levy its PCA on an annual basis with an annual "true up" at the end of each year. *Petition of Dakota Electric Association for Authority to Change its Schedule of Rates and Charges,* Docket No. E–111/GR–82–228 (April 29, 1983, at p. 24).