**HENNEPIN COUNTY COMMUNITY SERVICES DEPARTMENT, Relator,**

v.

**Sandra HALE, Commissioner, Minnesota Department of Administration, Jane E. Johnston, Respondents.**

No. C9–90–2122.

Court of Appeals of Minnesota.

May 14, 1991.

Review Denied July 24, 1991.

Michael Freeman, Hennepin County Atty., Arthur W. Katzman, Asst. Hennepin County Atty., Minneapolis, for Hennepin County Community Services Dept.

Hubert H. Humphrey, III, Atty. Gen., Martha J. Casserly, Asst. Atty. Gen., St. Paul, for Sandra Hale.

Donald E. Horton, Sonja R. Peterson, Horton and Associates, Minneapolis, for Jane E. Johnston.

Considered and decided by RANDALL, P.J., and SHORT and PETERSON, JJ.

## OPINION

PETERSON, Judge.

This appeal is from an order of the Department of Administration directing Hennepin County to correct and amend certain data concerning respondent Jane E. Johnston. The data in question are part of a report submitted to the Hennepin County District Court pursuant to an order issued by the court in a prior action between Johnston, Hennepin County, and a third party who is not a party to this appeal.

The report summarized an investigation of a child sexual abuse complaint made against Johnston. The investigation was conducted by Hennepin County employees and the report concluded that the child sexual abuse report was substantiated.

Pursuant to procedures established by Minn.Stat. § 13.04, subd. 4 (1984), Johnston requested that Hennepin County either remove the report from its records or replace it with an accurate and complete report. The county denied the request and stated that it was the county's determination that the report was accurate and complete.

Johnston appealed the determination of Hennepin County to the Commissioner of Administration pursuant to Minn.Stat. § 13.04, subd. 4. The Commissioner issued a notice of hearing and order for hearing, and a hearing was held before an administrative law judge. The administrative law judge issued findings of fact, conclusions and recommendations, recommending that the conclusion of the report be changed from "substantiated report of abuse" to "unable to substantiate." The Commissioner issued her findings of fact, conclusions and order adopting the administrative law judge's recommendations in their entirety. Hennepin County's subsequent motion for reconsideration was denied. Hennepin County appeals.

## FACTS

Jane E. Johnston obtained a master's degree in social work in 1976. In September 1982 she obtained her first employment as a psychotherapist with Michael Shea and Associates, a clinic of approximately eight therapists. In January 1983, Susan DeVries, a licensed psychologist with the clinic, referred a five-year-old girl, R., to Johnston for therapy. R. and her four-year-old sister, C., had been referred to clinic with other family members by the Hennepin County Community Services Department after the district court ordered therapy for them because a third child in the family had been the victim of sexual abuse by an unknown person while in the family home. Johnston saw R. individually five times during January through March 1983. She then saw R. and C. together nine times from March through May 1983.

Johnston was told by DeVries that there was physical abuse in the family, but she did not recall any mention of sexual abuse. Prior to May 1983, Johnston told DeVries that she thought the girls' mother was involved in the abuse. DeVries was the mother's therapist.

In early May 1983, Johnston and two other therapists at the Shea clinic announced that they would be leaving to establish their own practice. Johnston's financial arrangement with the clinic was that she received one half of her billings and the clinic received the other half. When she left the clinic, her clients were free to stay with her or to stay with the clinic.

On May 17, 1983, Deborah Silverstein, a social worker with Hennepin County Child Protection Services received a report from R. and C.'s mother that she had observed a change in her daughters' behavior in the prior two weeks. The mother told Silverstein that one child had rubbed the other child's breast and explained that, "Jane does this." The mother also stated that the girls had told her that "Jane plays poking games." The mother said the only "Jane" the girls knew was Jane Johnston.

On May 19, 1983, Silverstein, along with the girls' day care teacher, tried to interview C. and R. at the girls' home. Neither child would talk about their therapy sessions. Both children stated that they did not like to go to therapy sessions but did not state why. On May 20, 1983, the day care teacher talked to R. about the behav-

ior her mother had reported. R. told the teacher that she did not "play that game." On May 23, 1983, Silverstein talked with R. and C. again. The girls became very active and did not want to talk about or play out anything related to therapy.

On May 26, 1983, Silverstein and other employees of Shea clinic met with Johnston and told her about the complaint that had been made about her. Johnston stated that no behavior of the type described had occurred during her therapy sessions with R. and C. When asked to speculate about why the children would make such a report, Johnston speculated that they were attempting to get her into trouble due to their fear about having disclosed parental physical abuse to her.

DeVries met with the girls' mother on May 26, 1983. The mother stated that R. and C. were sitting next to each other when she asked them if they were ready to go to their therapy session. C. turned to R. and asked if she wanted to go play that poking game. The mother said that both girls then looked embarrassed and whispered to each other as if they had a secret. When the mother inquired as to what they meant, the girls associated "the poking game" with something they did with Jane during their therapy sessions. The mother also observed one of the girls rubbing her breast area and nipple. When the mother told the girl that wasn't a good thing to do C. responded, "Oh, it's okay, Jane does it with us." The mother inquired further. She tickled C. under her arm and asked if that was what Jane was doing and C. said "No" and repeated the breast and nipple fondling.

DeVries interviewed the girls together on June 23, 1983. She asked them who played the poking game with them. C. immediately responded that Mom played the poking game and the game was fun. R. was quite solemn in her facial expression and said the game was not fun. C. was giggling and silly throughout the rest of the conversation. DeVries presented the girls with anatomically correct dolls and asked them who played the poking game and where were they poked. C.

poked at the nipples and said that Dad poked her there and that Jane poked her there. DeVries asked C. whether various other people played the game with her, including her brother and DeVries. C. said yes to everyone DeVries asked her about.

DeVries then asked R. to talk about the poking game. Throughout the conversation, R. was serious in her demeanor with no smiling or laughing. DeVries asked R. if various people played the game with her. R. said no to each person DeVries named except Jane. When asked if she played the poking game here, R. looked at DeVries with great surprise on her face and responded, "No, not in your room, we played it in Jane's room." DeVries showed R. the female doll and asked where she played the poking game. R. pointed to the belly button and the genitals and rubbed the nipple back and forth in a manner similar to what her mother had demonstrated seeing. R. then looked at the doll for a few moments and said in a very serious voice, "I didn't want to play that game."

DeVries returned to C. and asked her again about the poking game. This time C. indicated that Linda, a teacher at the girls' day care center, played the game with her and demonstrated Linda poking her in the belly button, nipple, and eyes. C. also indicated that her mother played the game with her and pointed to the belly button, nipple and leg. C. was once again giggling and silly.

On June 27, 1983, DeVries conducted a videotaped interview with each child separately. She asked each of the girls questions about various people they interacted with, including what things they did with people they enjoyed and what things they did with people that they did not like or that scared them. R. indicated at various times during the session that Jane, Linda, Jason, and Laurie had all played the poking game with her and had poked her in the genital area. When asked to point out on a doll all of the places that Jane had poked her, R. pointed to the nose, hand, toes, eyes, hair, neck, nipple, belly button, and genital area. She looked very sad and unhappy about this game. She also said that

Jane and Laurie had played the poking game with C. When DeVries presented C. with similar questions, C. indicated that virtually everyone DeVries named had played the poking game with her. C. also focused on her dad and said that her dad was sometimes mean to her, slapped her, and made her kneel down when she was naughty.

During July 1983 a memo was circulated to the staff of the Hennepin County Child Protection and Child Welfare Divisions requesting that social workers report if they had any clients who were seeing Jane Johnston as a therapist. On July 14 a meeting was held with the social workers who responded. They were told that a complaint had been made against Johnston. Nine families were identified and interviewed to see if any problems had occurred in therapy. None of the children indicated any problem with Johnston.

On August 1, 1983 a motion for a temporary injunction requiring Hennepin County Community Services Department to complete its investigation into the allegations was heard by the trial court. Following the hearing the county was ordered to complete the investigation and file a report with the court by August 17, 1983. The report was submitted in compliance with this order. The report reached the conclusion that there had been a substantiated report of child sexual abuse and that Jane E. Johnston was the perpetrator. The conclusion was based on guidelines issued by the Minnesota Department of Public Welfare.

### ISSUES

I. Does Minn.Stat. § 13.04, subd. 4 (1984) authorize the Department of Administration to correct and amend facts and conclusions contained in a report prepared by county social workers concerning allegations of child sexual abuse made against an individual?

II. Are the findings and conclusions of the Commissioner regarding the claim of child sexual abuse against Johnston supported by substantial evidence?

### ANALYSIS

The scope of our review of agency decisions is limited.

In a judicial review under sections 14.-63 to 14.68, the court may affirm the decision of the agency or remand the case for further proceedings; or it may reverse or modify the decision if the substantial rights of the petitioners may have been prejudiced because the administrative finding, inferences, conclusions, or decisions are:

(a) In violation of constitutional provisions; or

(b) In excess of the statutory authority or jurisdiction of the agency; or

(c) Made upon unlawful procedure; or

(d) Affected by other error of law; or

(e) Unsupported by substantial evidence in view of the entire record as submitted; or

(f) Arbitrary or capricious.

Minn.Stat. § 14.69 (1984).

■ The decision of the administrative agency must be supported by substantial evidence. *Reserve Mining Co. v. Herbst*, 256 N.W.2d 808, 825 (Minn.1977). Substantial evidence means:

1) such relevant evidence as a reasonable mind might accept as adequate to support a conclusion; 2) more than a scintilla of evidence; 3) more than "some evidence"; 4) more than "any evidence"; and 5) evidence considered in its entirety.

*Id.*

### I.

Hennepin County contends that the Commissioner of Administration exceeded her statutory authority and jurisdiction by ordering the correction of the social workers' conclusion that the child abuse report concerning Johnston was substantiated. The county argues that the Commissioner has authority to order the correction of only factual errors in government data and that the Commissioner has no authority to substitute her opinion or conclusion for that of a professional conclusion of social workers when the underlying facts supporting the

conclusion have not been discredited. We disagree.

"[A]gency powers must be construed in light of the purposes for which they were created." *State v. Bruesehoff*, 343 N.W.2d 292, 295 (Minn.App.1984). The data practices act imposes upon officials responsible for government data a duty to "establish procedures to assure that all data on individuals is accurate, complete, and current for the purposes for which it was collected." Minn.Stat. § 13.05, subd. 5 (1984). The data practices act also establishes the right of an individual data subject to contest the accuracy or completeness of data about the individual. Minn.Stat. § 13.04, subd. 4 (1984).

Together, the officials' duty to assure the accuracy and completeness of data and the individual's right to contest the accuracy and completeness of data demonstrate a legislative purpose of preventing confusion, mistake, embarrassment, ridicule, or other harm that the subject of government data could suffer if the data are not accurate and complete. The authority of the Commissioner must be construed in light of this purpose.

"The extent of jurisdiction or authority bestowed upon an administrative agency is measured by the statute from which it derives its authority." *Frost–Benco Elec. Ass'n v. Minnesota Pub. Utils. Comm'n*, 358 N.W.2d 639, 642 (Minn.1984).

■ The government data practices act vests final agency authority to determine the accuracy and completeness of disputed government data in the Commissioner of Administration. This authority extends to all public or private data on individuals. Minn.Stat. § 13.04, subd. 4. "Public data on individuals" means data that are accessible to the public. Minn.Stat. § 13.02, subd. 15 (1984). "Private data on individuals" means data that are not accessible to the public, but are accessible to the individual subject of the data. Minn.Stat. § 13.02, subd. 12.

"Data on individuals" means *all* government data in which any individual is or can be identified as the subject of that data, unless the appearance of the name

or other identifying data can be clearly demonstrated to be only incidental to the data and the data are not accessed by the name or other identifying data of any individual.

Minn.Stat. § 13.02, subd. 5 (emphasis added).

"Government data" means *all* data collected, created, received, maintained or disseminated by any state agency, political subdivision, or statewide system regardless of its physical form, storage media or conditions of use.

Minn.Stat. § 13.02, subd. 7 (emphasis added).

■ The entire investigative report prepared by the Hennepin County social workers is data created and maintained by a political subdivision. As an individual subject of this data, Johnston may contest the accuracy and completeness of any of the data that identifies her as the subject of the data, including the conclusions of the social workers who prepared the report.

The data practices act establishes the procedure to be followed by an individual data subject who wishes to contest the accuracy or completeness of data. Minn. Stat. § 13.04, subd. 4, states in part:

An individual may contest the accuracy or completeness of public or private data. To exercise this right, an individual shall notify in writing the responsible authority describing the nature of the disagreement. The responsible authority shall within 30 days either: (a) correct the data found to be inaccurate or incomplete and attempt to notify past recipients of inaccurate or incomplete data, including recipients named by the individual; or (b) notify the individual that he believes the data to be correct. Data in dispute shall be disclosed only if the individual's statement of disagreement is included with the disclosed data.

■ The determination of the responsible authority that contested data are correct may be "appealed pursuant to the provisions of the administrative procedure act relating to contested cases." *Id.* The administrative procedure act does not itself

provide a right to a contested case hearing, but establishes procedures to be followed when another statute provides that right. *In re People's Coop. Power Ass'n, Inc.*, 447 N.W.2d 11, 13 (Minn.App.1989), *pet. for rev. denied* (Minn. Jan. 8, 1990). To determine the extent of the Commissioner's jurisdiction and authority to correct contested data, we must look at both the data practices act, Minn.Stat. §§ 13.01–.88 (1984), and the administrative procedure act, Minn. Stat. §§ 14.01–.69 (1984).

The extent of the Commissioner's authority in an appeal under subdivision 4 of section 13.04 depends upon the meaning of the word "appealed" as it appears in that statute. In *State ex rel. Spurck v. Civil Serv. Bd.*, 226 Minn. 240, 32 N.W.2d 574 (1948), the Minnesota Supreme Court considered the rights a party has on appeal in an administrative proceeding when the statute that created the right of appeal is silent as to those rights. *Spurck* involved an appeal by a civil service employee from an order of the state civil service board affirming the state civil service director's classification of the employee's job. The relevant statute gave the civil service director authority to classify civil service positions, subject to an appeal to the civil service board. The nature of the appeal was not described.

In a carefully reasoned opinion, the court determined that:

> the word "appeal" in a statute governing administrative proceedings will be deemed, in the absence of tokens of a contrary legislative intention, to be used with its strict and ordinary meaning.

*Id.* at 245–46, 32 N.W.2d at 579.

The court went on to explain:

> "The term 'appeal,' in its original, technical and appropriate sense, meant the removal of a suit from an inferior court, after final judgment therein, to a superior court, and placing the case in the latter court to be again tried *de novo* upon its merits, just as though it had never been tried in the inferior court.
> * * *
> 
> *    *    *    *    *    *

> * * * We are of opinion that when this statute granted an appeal without requiring the evidence to be preserved and transmitted some greater remedy was intended, and that must have been a retrial of the charges."

*Id.* at 246, 32 N.W.2d at 579 (quoting *City of Rockford v. Compton*, 115 Ill.App. 406, 411, 414) (1904).

The court concluded that when the statute that creates a right of appeal in an administrative proceeding is silent as to how the appeal shall be tried, it means that the appeal should be a trial with all the incidents of a trial. *Id.* at 247, 32 N.W.2d at 579.

The data practices act, however, is not silent as to how the appeal granted to Johnston shall be tried. The appeal must be conducted "pursuant to the provisions of the administrative procedure act relating to contested cases." Minn.Stat. § 13.04, subd. 4. Required procedures in a contested case proceeding include the right to be heard after reasonable notice, the production of witnesses and documents, the taking of evidence, examination and cross-examination of witnesses, representation by counsel, presentation of arguments, and decision upon the record. *See* Minn.R. 1400. 5100–.8300 (1983). These required procedures are the incidents of a trial.

■ If the word "appeal" in a statute governing administrative proceedings is deemed, in the absence of any indication of a contrary legislative intent, to mean a trial de novo, subdivision 4 of section 13.04 must be interpreted to require de novo review by the Commissioner because every indication of legislative intent manifests an intention that the appeal include the incidents of a trial.

■ Most significantly, the contested case procedures require that an agency decision "shall include the *agency's* findings of fact and conclusions on all material issues." Minn.Stat. § 14.62, subd. 1 (1984). (emphasis added). The Commissioner is prohibited from simply adopting the conclusions of Hennepin County. The Commissioner is required to adopt her own findings of fact and to draw her own conclu-

sions from these facts. A failure to do so does not meet the requirements of the contested case procedures.

## II.

■ Hennepin County argues that, even if the Commissioner has authority to substitute her conclusion for the conclusion of the social workers, her decision to do so is unsupported by the evidence. The Department of Public Welfare Social Services Manual, R. XIV–4736 (Jan. 1, 1981), relied upon by the social workers who reached the contested conclusion provided the following definitions related to child protection maltreatment reports:

*Determination of Case Status*

1. *Substantiated:*

   a. An admission of the fact of abuse or neglect by persons responsible;

   b. An adjudication of abuse or neglect; or

   c. Any other form of confirmation deemed valid by the local agency.

   NOTE: Substantiated does not mean adjudicated. For the local agency to determine that abuse or neglect has occurred does not require the type of evidence needed to file an assault petition against a perpetrator. However, an adjudicated case would also constitute a substantiated case.

2. *Unsubstantiated:* The complaint is found to have no substance; no reason to suspect that abuse or neglect has occurred.

3. *Unable to Substantiate:* Not enough criteria for a substantied report are present, but there is reason to suspect abuse or neglect; e.g., the child shows signs of physical or emotional abuse or neglect but the social worker cannot logically refute the suspected perpetrator's denial of involvement.

4. *Not Yet Determined:* The assessment is not yet completed. When a determination is made, the status of the report must be submitted to the State Agency, either in writing or by phone.

NOTE: When amending or completing an already submitted report refer to report number or agency case number.

In our determination whether the Commissioner's decision is supported by substantial evidence, we must consider the evidence in its entirety. *Reserve Mining Co.,* 256 N.W.2d at 825. Unless manifestly unjust, inferences must be accepted even though it may appear that contrary inferences would be better supported. *Id.* The burden is upon the party challenging the agency's findings to establish that the findings are not supported by the evidence in the record, considered in its entirety. *Id.*

We find there is substantial evidence in the record to support the Commissioner's decision that the contested report was inaccurate in concluding that the report of abuse by Johnston was substantiated. The testimony of the children and their mother was sufficient to conclude there is reason to suspect abuse or neglect. However, in light of the inconsistent and changing nature of the children's testimony, the fact that the children testified that various people other than Johnston played the poking game with them, and the testimony that other children who received therapy from Johnston had no complaints, the social workers could not logically refute Johnston's denial.

## DECISION

The order of the Commissioner of Administration is affirmed.

Affirmed.

SHORT, Judge (dissenting).

I respectfully dissent. The Minnesota Government Data Practices Act allows for correction of data found to be inaccurate or incomplete. Minn.Stat. § 13.04, subd. 4 (1990). However, it is not a vehicle for amending the judgments of state officials. *See Rogers v. United States Dep't of Labor,* 607 F.Supp. 697, 699 (N.D.Cal.1985). The Commissioner of Administration did not find the data on Johnston to be factually inaccurate or incomplete. Rather, the Commissioner reweighed the evidence and second-guessed the subjective evaluation of

the social worker. This is not a case where the correction of inaccurate facts requires the correction of an opinion based on those facts. I would therefore reverse the orders of the Commissioner.