**Holly ULSTAD, Appellant,**

v.

**Charles BRENNY, Andy Peterson, Respondents.**

No. C9–01–2196.

Court of Appeals of Minnesota.

June 25, 2002.

Stephen D. Gabrielson, Gabrielson Law Offices, Ltd., Sartell, MN, for appellant.

Frederick L. Grunke, Rajkowski Hansmeier, Ltd., St. Cloud, MN, for respondent Brenny.

Marcus J. Christianson, Christianson, Stoneberg, Giles & Stroup, P.A., Marshall, MN, for respondent Peterson.

Considered and decided by KLAPHAKE, Presiding Judge, HALBROOKS, Judge, and HANSON, Judge.

## OPINION

KLAPHAKE, Judge.

Appellant Holly Ulstad was employed by a temporary agency to work at respondent Charles Brenny's insurance office, where she was injured in a fall. Although she received workers' compensation through the temporary agency, she brought this

negligence action against Brenny. Applying the loaned servant doctrine, the district court determined that the temporary agency was Ulstad's general employer, that Brenny was her special employer, and that her exclusive remedy was under workers' compensation law. Ulstad contends that the loaned servant doctrine does not preclude a negligence action against Brenny. We disagree and affirm.

## FACTS

On March 4, 1998, Ulstad slipped and fell on some steps, injuring her neck, at Brenny's Allstate Insurance Agency in Brainerd, Minnesota. Brenny owns the building, and respondent Andy Peterson constructed and installed the steps on which appellant fell.

At the time of her accident, Ulstad was an employee of Checks and Balances, Inc. (C & B). Her actual job duties, as office manager and insurance producer selling various Allstate products, were performed at Brenny's agency.

Beginning in 1994, Brenny contracted with C & B to provide him with his agency staff, and since that time only employees hired by C & B were placed at his agency. Brenny's contract with C & B provided that C & B would, as an independent contractor, "employ, manage, and supervise all employees assigned to [respondent's] location" and would

> be responsible for (i) recruiting, hiring, evaluating, supervising, firing and disciplining its employees, (ii) maintaining all necessary personnel and payroll records for its employees, (iii) computing the wages payable to its employees and withholding applicable * * * taxes.

Brenny's use of C & B as a third-party employer, to hire, supervise, and pay his staff, was consistent with Allstate policy.

Ulstad began working at Brenny's agency in October 1996. Although she sought the job through Michael Miller, an Allstate district manager, she was hired by C & B. At the time of her hiring, Ulstad, Brenny, and C & B signed a non-compete agreement that referred to Ulstad as a "service provider (employee)" and Brenny as "Allstate Insurance Co. (supervisor)." Also at the time of Ulstad's hiring, Miller identified several problems with Brenny's agency that he wanted Ulstad to address in her role as office manager and insurance producer. Brenny had the authority to determine the number of hours Ulstad worked, but Ulstad determined her own work schedule. Brenny and Ulstad also staggered their annual vacations to insure that the office was staffed. Ulstad was covered under C & B's workers' compensation insurance policy, and Brenny held this type of insurance only for himself.

After her injury, Ulstad received workers' compensation benefits from C & B. C & B refused to fill Ulstad's position at the agency until a doctor determined whether she could return to work.

In November 1998, Ulstad initiated this negligence action against Brenny and Peterson, claiming that Peterson negligently constructed and installed the steps and that Brenny negligently maintained the premises. Brenny moved for partial summary judgment, arguing that Ulstad's exclusive remedy was under workers' compensation law. The district court agreed, granted Brenny's motion for summary judgment, and dismissed Ulstad's negligence action against Brenny. Thereafter, in accordance with a settlement between Peterson and Brenny on Peterson's cross-claim against Brenny, the district court dismissed the cross-claim and entered final judgment in favor of Brenny.

## ISSUE

■ Did the district court err in concluding that Ulstad was a loaned servant for purposes of determining whether she was barred from suing Brenny in tort because of the exclusivity provisions of the Workers' Compensation Act?

## ANALYSIS

On appeal from summary judgment, an appellate court's duty is to determine whether any genuine issues of material fact exist and whether the district court erred in its application of the law. *Cummings v. Koehnen,* 568 N.W.2d 418, 420 (Minn.1997). "A reviewing court must view the evidence in the light most favorable to the party against whom summary judgment was granted." *Vetter v. Sec. Continental Ins. Co.,* 567 N.W.2d 516, 520 (Minn.1997) (citation omitted). This court gives de novo review to a district court's determination of a purely legal question. *Frost–Benco Elec. Assoc. v. Minn. Pub. Utils. Comm'n,* 358 N.W.2d 639, 642 (Minn.1984); *see Meiske v. Lift–Stak & Stor, Inc.,* 599 N.W.2d 175, 177 (Minn.App. 1999) (where there is no factual dispute, review is de novo).

■ With the exception of excluded types of employment, the Workers' Compensation Act (act) provides the exclusive remedy for an employee injured in the scope of his or her employment. Minn. Stat. § 176.031, .041 (2000). Here, the district court held that Ulstad was a loaned servant for purposes of the act and that Brenny could not be sued in tort because both he and C & B were considered her employers. Under the loaned servant doctrine,

> if an employer loans an employee to another employer for a particular service, that employee may become the employee of the borrowing employer and

may look to either employer for workers' compensation benefits.

*Minn. Brewing Co. v. Egan & Sons, Co.,* 574 N.W.2d 54, 63 (Minn.1998) (citation omitted). The "special employer," to whom the employee is lent by the "general employer," is immune from tort suit if three conditions are met:

> (1) the employee has made a contract for hire, express or implied, with the special employer; (2) the work being done is essentially that of the special employer; and (3) the special employer has the right to control the details of the work.

*Newland v. Overland Exp., Inc.,* 295 N.W.2d 615, 618 (Minn.1980) (citing *Danek v. Meldrum Mfg. & Eng'g Co.,* 312 Minn. 404, 408, 252 N.W.2d 255, 258 (1977) (seminal case on this subject)).

Ulstad claims that these conditions are not present here and that the loaned servant doctrine does not apply because: (1) C & B does not fit the definition of a labor broker as defined in the case law; (2) the record does not show that Brenny controlled Ulstad's work; and (3) there was no employment contract, either express or implied, between the Brenny and Ulstad. We address each argument separately below.

■ Ulstad first contends that C & B does not meet the definition of labor broker. She argues that under the traditional definition of the term, the labor broker knows little or no details of the employee's work for the special employer. Here, Ulstad asserts, C & B "directed and controlled her activities."

■ A labor broker is defined as a "business [that] hires employees and in effect sells their services to a second employer in need of temporary help." *Smieja v. City of Browerville,* 406 N.W.2d 325, 327 (Minn.App.1987). In *Danek,* 312

Minn. at 408, 252 N.W.2d at 258, the supreme court rejected a control argument similar to the one made here by Ulstad. There, Geradeen Danek was injured while operating a punch press machine as a temporary employee and argued that her labor broker was her true employer because it "hired and had the right to fire * * * [her], compensated her directly, and paid the expenses of her social security taxes and workers' compensation insurance * * *." *Id.* The supreme court rejected Danek's argument, concluding that the labor broker did not have "the right to control the details of the performance of [Danek's] work," and that the work Danek did was solely for her special employer and under its control. *Id.; see Smieja,* 406 N.W.2d at 327–28 (employee of federally funded summer employment program also employee of school district under loaned servant doctrine, where school district controlled employee's work).

Likewise, here, C & B retained primary authority over the terms of Ulstad's employment but did not have control over her daily work. Thus, C & B met the definition of labor broker for purposes of applying the loaned servant doctrine. While the duration of Ulstad's employment was apparently for an indefinite rather than a temporary term and is longer than the temporary terms of employment contemplated in either *Danek* or *Smieja,* these facts tend to support the finding that Brenny was Ulstad's special employer.

■ Ulstad next argues that Brenny did not have the right to control the details of her work. While Brenny admitted that Ulstad was never his employee, he stated that he could "control her work," including her "job performance, job responsibility, what I needed done and how many hours I could request to have her [at work]." In arranging for Ulstad's employment, the parties contemplated that Ulstad would work only at Brenny's agency and do his work, as office manager and producer. Thus, while Brenny may not have had actual control over every aspect of Ulstad's employment, his right to control the essential aspects of her work is dispositive on this issue. The district court properly concluded that Brenny controlled Ulstad's day-to-day employment for purposes of application of the loaned servant doctrine. *See Danek,* 312 Minn. at 408, 252 N.W.2d at 258 (person held to be employer of special employer even where general employer controlled her hiring, firing, pay, and payment of other expenses).

■ Ulstad finally contends that there is no contract, express or implied, between her and Brenny. In considering this aspect of the loaned servant doctrine, Minnesota courts have not required the existence of an actual contract; they only require the employee's consent to the employment relationship with the special employer. *Smieja,* 406 N.W.2d at 326–27 (in order for condition of existence of contract to be met, employee must have "understood and consented to an employment relationship" with special employer). Often, the issue of the employee's consent to the employment relationship is determinative. *Id.* at 327.

Here, there is strong evidence that Ulstad consented to the employment relationship. Before being hired to work at Brenny's agency, she held a similar position at an insurance agency in Rogers, Minnesota. Her relocation to Brainerd was precipitated by a relocation made by her parents to the Brainerd area. Even Ulstad acknowledges that she initiated a transfer of her employment by contacting Miller, her district manager, seeking an assignment at Brenny's agency. Thus, for purposes of application of the loaned servant doctrine, Ulstad consented to work with Brenny, her special employer. *See Danek,* 312 Minn. at 412, 252 N.W.2d at

260 (employee deemed to have consented to special relationship when employee given option by labor broker to work at and consented to work at plant as punch press operator).[1]

## DECISION

The district court did not err in concluding that Ulstad was a loaned servant and that she was thus barred from suing Brenny in tort because of the exclusivity provisions of the Workers' Compensation Act.

**Affirmed.**

1.  Brenny should note that he may have been underinsured for workers' compensation by failing to insure Ulstad as his employee. Because Ulstad was considered his loaned servant, she could "look to either employer for workers' compensation benefits." *Minn. Brewing Co.*, 574 N.W.2d at 63.