# STATE OF MINNESOTA
# IN COURT OF APPEALS
# A16-0249
# A16-0250

Stephanie Rush, et al.,
Appellants (A16-0249),

vs.

The Westwood Village Partnership, et al.,
Respondents (A16-0249),

and

Jerry Plummer, et al.,
Appellants (A16-0250),

vs.

Riverside Apartments of St. Cloud Limited Partnership, et al.,
Respondents (A16-0250).

**Filed December 5, 2016**
**Affirmed**
**Reilly, Judge**

Benton County District Court
File Nos. 05-CV-15-2075, 05-CV-15-1887

Mark Iris, Doug Clark, Mid-Minnesota Legal Aid, St. Cloud, Minnesota (for appellants)

Gerald W. Von Korff, John J. Meuers, Rinke Noonan, St. Cloud, Minnesota (for respondents)

Considered and decided by Reilly, Presiding Judge; Halbrooks, Judge; and Johnson, Judge.

**S Y L L A B U S**

Minnesota Statutes section 504B.161, subdivision 1(a)(2) (2014), imposing a covenant of reasonable repair upon the landlord of residential premises, does not extend to a tenant's personal property. Minnesota Statutes section 504B.161, subdivision 1(a)(1) (2014), recognizing the covenant to ensure that a residential premises is fit for its intended use, does not impose a duty on a landlord to employ a tenant's chosen method of pest eradication.

**O P I N I O N**

**REILLY**, Judge

In these consolidated appeals after separate court trials, appellant-tenants challenge the district court's denial of their rent-escrow actions under Minnesota Statutes section 504B.161 (2014). The questions presented are: (1) whether a landlord breaches the covenant of reasonable repair by requiring a residential tenant to cooperate with pest eradication efforts and (2) whether a landlord commits a per se breach of the covenant to ensure that a residential premises is fit for its intended use by electing one method of repair over the tenant's preferred method. We conclude that section 504B.161, subdivision 1(a), neither compels a landlord to bear the costs of the tenant's personal property damaged by pest eradication nor requires the landlord to pay for the tenant's preferred repair method, and we therefore affirm the district court's denial of the rent-escrow actions.

**FACTS**

**St. Cloud Housing and Redevelopment Authority Pest-Control Policy**

St. Cloud Housing and Redevelopment Authority (the HRA) is the owner and property manager of the Westwood Village and Riverside apartment complexes. The HRA adopted a Pest-Infestation Policy to control bedbug infestations in its units, including apartments located in Westwood Village and Riverside. The policy contemplates using chemical treatments to control bedbug infestations. The HRA developed a bedbug checklist providing instructions on how to prepare an apartment for chemical treatment. The checklist advises the tenant to wash bedding and clothing; store certain items in plastic bags or storage bins; vacuum and wash floors; throw away trash; provide access to walls, closets, and areas around furniture; and discard box springs, mattresses, and upholstered furniture. The HRA does not assist tenants in completing the checklist nor does it compensate tenants for the cost of their discarded personal property or costs associated with preparing an apartment for treatment. Pest control is addressed in a lease addendum, which states that the tenant and the HRA "must work together to prevent and eliminate the infestation of bedbugs." The lease addendum provides that the HRA will "prevent and eliminate" bedbugs at the HRA's expense, although it places an obligation on the tenant to "cooperate with the [the HRA]" by allowing reasonable access for inspections, preparing an apartment for treatment, and "disposing of property which may be the source [of] the infestation or which may serve as a home for pests."

The HRA engages the services of a pest-control company to treat bedbug infestations in residential apartments. The pest-control company offers two types of

3

treatments: a chemical-only treatment and a heat treatment. The heat treatment is a one-day process during which technicians heat an apartment to over 120 degrees for at least five hours; chemical treatments of the perimeter of the apartment precede and follow the heating. The heat treatment costs an average of $1,100 to $1,500 per apartment. The chemical-only treatment is described as an "intensive first treatment" with a chemical spray, with follow-up chemical treatments at two and four weeks after the initial treatment. The insecticide used in the chemical treatment has a residual effect that continues to kill bedbugs for several weeks after treatment. The average cost of the chemical-only treatment is $400. The success rate for eradicating bedbugs from a premises is the same for both treatment methods.

**Stephanie Rush and Margaret Domeier**

Stephanie Rush and Margaret Domeier lease an apartment from the HRA in Westwood Village. Rush discovered bedbugs in the apartment in September 2015 and reported the infestation to the property manager, who provided Rush and Domeier with a bedbug checklist to prepare the apartment for treatment. The property manager stated that the HRA would cover the cost of a chemical-only treatment at no expense to Rush and Domeier. Rush and Domeier requested a heat treatment, which the HRA declined to provide on the ground that it was more expensive. Rush and Domeier agreed to go forward with the chemical-only treatment. They prepared for the first chemical application by moving some of their belongings to storage; cleaning the apartment; and discarding mattresses, electronics, furniture, and other personal belongings. The HRA engaged a pest-control company to treat Rush and Domeier's apartment for the bedbug infestation;

4

chemical treatments were applied on October 6, October 20, and November 3. Rush testified that she had not seen any bedbugs in the apartment since the November 3 chemical treatment was completed. Following the first chemical treatment, Rush and Domeier filed an Affidavit of Rent Escrow requesting heat treatment or, alternatively, seeking monetary compensation for their discarded personal property and consequential damages.

**Jerry and Roslyn Plummer**

Jerry and Roslyn Plummer lease an apartment from the HRA in Riverside Apartments. In August or September 2015, the Plummers observed bedbugs in their apartment and reported this to the property manager. The property manager offered the Plummers the option of receiving a chemical-only treatment at no cost or paying for a heat treatment themselves. Because the Plummers did not wish to discard their furniture, they requested that the HRA pay the full cost of the heat treatment; their request was denied. The property manager scheduled a chemical-only treatment for October 6 and provided the Plummers with notice of the treatment and the bedbug checklist. The pest-control company arrived at the Plummers' apartment on the scheduled date. The Plummers had not adequately prepared the apartment for treatment, and the pest-control company was unable to apply the chemicals. The Plummers refused to discard their furniture, and the treatment was not rescheduled. The Plummers filed an Affidavit of Rent Escrow, requesting that the HRA repair the bedbug infestation and requesting "[r]eimbursement for any property damage and any other expenses."

**District Court Actions**

The district court held a court trial on Rush and Domeier's rent-escrow action on November 12, 2015, and held a court trial on the Plummers' rent-escrow action on November 12 and 19, 2015. The district court issued separate orders in December 2015, denying all tenants' claims for relief. In both cases, the district court determined that Minnesota caselaw supports the HRA's position that "there is no breach of the warranty of habitability unless a landlord has notice of the defective condition and fails to cure the condition within a reasonable time." In Rush and Domeier's case, the district court determined that the HRA "took steps to cure the defect in a reasonable amount of time," where the presence of bedbugs was first reported on September 25 and the first chemical treatment of the premises occurred on October 6. In the Plummers' case, the district court found that the HRA "took steps to cure the defect in a reasonable amount of time but were unable to do so due to [the Plummers'] lack of cooperation."

The district court addressed tenants' argument that the HRA should have provided heat treatments at no cost to tenants, stating:

> [Tenants'] argument regarding repairs for bedbugs goes beyond the requirements of the statute. The statute imposes a covenant on landlords "to keep the premises in *reasonable* repair." Minn. Stat. § 504B.161, Subd. 1(2)(emphasis added). Based on the evidence introduced at the hearing, the Court concludes that the repairs for bedbugs [undertaken or] offered by [the HRA] were reasonable within the meaning of the statute.

The district court rejected arguments from both Rush and Domeier and the Plummers that the HRA impermissibly shifted physical and financial duties to tenants,

6

stating in each instance that "[i]mposing the requirement that landlords make repairs that are the least intrusive or the least expensive to a tenant goes beyond the language of the statute, which only requires reasonableness."

The district court recognized that the statute requires a landlord "to keep 'the *premises* in reasonable repair.'" The district court stated that tenants were seeking to extend the HRA's obligation to repair the premises to include repairs to their personal property, without a showing that the HRA was at fault. The district court rejected this argument, reasoning that tenants' position "goes beyond the language of the statute and is not supported by any legally binding precedent." The district court therefore determined that the HRA did not breach the covenant of habitability and concluded that tenants are not entitled to rent abatement or consequential damages.

This consolidated appeal follows.

## ISSUES

1.    Did the district court err by determining that the HRA did not breach the covenant to keep the apartment in reasonable repair?

2.    Did the district court err by determining that the HRA did not breach the covenant to keep the apartment fit for its intended use?

## ANALYSIS

We do not defer to the district court's decision on a purely legal issue, *Frost-Benco Elec. Ass'n v. Minn. Pub. Utils. Comm'n*, 358 N.W.2d 639, 642 (Minn. 1984), and we review the construction of a statute de novo, *Educ. Minn.-Chisholm v. Indep. Sch. Dist. No. 695*, 662 N.W.2d 139, 143 (Minn. 2003).

7

## I.

Minnesota law establishes a number of covenants that are implied in the lease of every residential premises and that are known as the covenants of habitability. *See Fritz v. Warthen*, 298 Minn. 54, 56-57, 213 N.W.2d 339, 340-41 (1973). Relevant to this dispute, the landlord covenants:

> (1) that the premises and all common areas are fit for the use intended by the parties; [and]
>
> (2) to keep the premises in reasonable repair during the term of the lease . . . , except when the disrepair has been caused by the willful, malicious, or irresponsible conduct of the tenant . . . .

Minn. Stat. § 504B.161, subd. 1(a).

These statutory covenants cannot be waived and are liberally construed. *Id*., subds. 1(b), 3 (2014). A residential tenant may initiate a rent-escrow action to remedy violations of the covenants of habitability. Minn. Stat. § 504B.385, subd. 1 (2014); *see* Minn. Stat. § 504B.001, subd. 14 (2014) (defining "violation" to include violations of the covenants of habitability in section 504B.161, subdivision 1). If the district court finds that a violation exists, it may "order relief as provided in section 504B.425, including retroactive rent abatement." Minn. Stat. § 504B.385, subd. 9(a)(1) (2014).

Tenants argue that the HRA violated the covenant of reasonable repair by shifting certain of the physical and financial duties associated with the pest-infestation repair onto tenants, contrary to the plain language of section 504B.161, subdivision 1(a)(2). *See* Minn. Stat. § 504B.161, subd. 1(b) (providing that the parties to a lease of a residential premises "may not waive or modify the covenants imposed by this section"). Specifically, tenants

argue that the HRA violated the covenant of reasonable repair by requiring tenants, at their own expense, to move their belongings out of the apartment, to discard furnishings that could harbor bedbugs and lead to a re-infestation, and to launder and clean their apartments.

Tenants' argument presents a legal question of statutory construction subject to de novo review. *State v. Ambaye*, 616 N.W.2d 256, 258 (Minn. 2000). "The object of all interpretation and construction of laws is to ascertain and effectuate the intention of the legislature." Minn. Stat. § 645.16 (2014). The "touchstone" for statutory interpretation is the plain meaning of the language itself. *ILHC of Eagan, LLC v. County of Dakota*, 693 N.W.2d 412, 419 (Minn. 2005). Thus, when the words of a statute are "clear, explicit, unambiguous, and free from obscurity," we expound the language "according to the common sense and ordinary meaning of the words." *Krueger v. Zeman Constr. Co.*, 758 N.W.2d 881, 885 (Minn. App. 2008) (quotation omitted), *aff'd*, 781 N.W.2d 858 (Minn. 2010). "When a statute's meaning is plain from its language as applied to the facts of the particular case, a judicial construction is not necessary." *Id*. (quotation omitted).

Section 504B.161, subdivision 1(a)(2), imposes upon the landlord a duty "to keep the premises in reasonable repair." The definitional section of chapter 504B does not explicitly define "premises." *See* Minn. Stat. § 504B.001 (2014). When a statute fails to specifically define a term, we construe the word according to its common and approved usage. Minn. Stat. § 645.08(1) (2014). *The American Heritage Dictionary* defines "premises" as "[l]and, the buildings on it, or both the land and the buildings on it," or as "[a] building or particular portion of a building." *The American Heritage Dictionary of the English Language* 1390 (5th ed. 2011). *Black's Law Dictionary* similarly defines

9

"premises" as "[a] house or building, along with its grounds." *Black's Law Dictionary* 1371 (10th ed. 2014); *see also McSherry v. Heimer*, 132 Minn. 260, 263, 156 N.W. 130, 132 (1916) ("The word 'premises' means land and the buildings and structures thereon. Standard dictionaries so define it."). We therefore conclude that the plain meaning of "premises" is the portion of the building in which the tenants reside, i.e., the apartment itself. A plain reading of section 504B.161, subdivision 1(a)(2), does not support tenants' argument that the HRA's statutory responsibility to keep the leased premises in reasonable repair extends to tenants' personal property. Thus, under the plain meaning of the statute, the HRA's responsibility was limited to the condition of the leased premises itself and did not include the condition of tenants' personal belongings, furniture, or other personal effects. The HRA did not violate the covenant of reasonable repair by requiring tenants to reasonably cooperate with repairs or to bear the cost of cleaning their apartment and replacing damaged personal property.

If the legislature had intended to make the HRA responsible for the condition of the tenants' personal property, it could have drafted language to that effect in the statute. Tenants are attempting to expand the scope of the covenant of reasonable repair beyond that articulated by the legislature, and "the task of extending existing law falls to the supreme court or the legislature, but it does not fall to this court." *Tereault v. Palmer*, 413 N.W.2d 283, 286 (Minn. App. 1987), *review denied* (Minn. Dec. 18, 1987).

Tenants rely on *City of Minneapolis v. Ellis*, in which this court held that a landlord could not transfer to a lessee the ultimate responsibility of complying with applicable health and safety laws. 441 N.W.2d 134, 138 (Minn. App. 1989), *review denied* (Minn. July 12,

1989). *Ellis* is distinguishable. In that case, the tenants had agreed in writing to replace broken glass and torn screens during the term of the lease. *Id*. at 137-38. When the glass and screens became damaged, the landlord refused to repair them on the ground that the tenants were responsible for the repairs. *Id*. at 135-36. The landlord was subsequently convicted of failing to comply with a rental property repair order in violation of Minneapolis ordinance. *Id*. at 135. The relevant issue on appeal was whether the landlord was responsible for complying with applicable health and safety laws of the state and local governments during the term of the lease. *Id*. at 137-38. We ruled that "the ultimate responsibility for compliance with [city health and safety laws] remains with the lessor/licensor" and that the landlord's "attempt to transfer this ultimate responsibility [to tenants] must fail under the statutory prohibition," and we affirmed the conviction. *Id*. at 138.

Tenants argue that *Ellis* is analogous because the HRA's lease addendum, pest-infestation policy, and bedbug checklist attempt to transfer financial and labor costs associated with repairs onto tenants. The district court rejected this argument, finding that the HRA's lease documents and policies "did not place the sole responsibility for addressing bedbugs on the tenants, but rather addressed how [the HRA] would conduct the repair and what the responsibilities were of both the tenant and the [HRA]." The district court found that a tenant's cooperation "is critical to the elimination of bedbugs in a unit, regardless of the treatment method undertaken." Based upon these findings, the district court concluded that tenants' argument that the HRA should bear the entire cost of eradicating the bedbugs, including costs associated with moving, cleaning, and replacing

11

personal property, "goes beyond the requirements of the statute." For the reasons stated above, we agree and conclude that the district court properly determined that the HRA did not breach the covenant of reasonable repair.

## II.

The covenant of habitability also requires the landlord to ensure that the premises are "fit for the use intended by the parties." Minn. Stat. § 504B.161, subd. 1(a)(1). Tenants challenge the HRA's decision to use a chemical-only treatment rather than a heat treatment to treat the bedbug infestations, arguing that the HRA failed to ensure that the premises were fit for their intended use by compelling them to "continue to live with bedbugs during the lengthy [chemical-only] treatment process."[1]

Tenants cite *Delamater v. Foreman* for the proposition that a bedbug infestation is a breach of the landlord's covenant of habitability and constitutes a constructive eviction. 184 Minn. 428, 239 N.W. 148 (1931). We note first that *Delamater* predates the legislature's enactment of statutory covenants of habitability, which control our analysis. Moreover, *Delamater* does not compel a conclusion that a landlord commits a per se violation of the covenant of habitability by declining to pay for the repair method of tenant's choosing. In *Delamater*, the leased apartment became infested with bedbugs. *Id.* at 429-30, 239 N.W.2d at 149. The *Delamater* court held that the responsibility for ridding the apartment of bedbugs could rest with either the landlord or the tenant, depending upon

---

[1] We are not unaware of the inconvenience chemical treatment caused tenants. However, the unfortunate consequences of eradicating bedbugs in apartments is outweighed by the consequences of not eradicating bedbugs.

12

which party was at fault for the verminous infestation. *Id.* The *Delamater* court affirmed the judgment against the landlord noting that the tenants' "vigilant efforts" to rid the apartment of bedbugs had failed.[2] *Id.* at 429-30, 239 N.W. at 149.

The present case is readily distinguishable. Here, the district court made a number of factual findings related to the testimony adduced at trial regarding bedbug treatment and treatment preparation. Tenants do not challenge these factual findings. Two employees of the pest-control company testified that cleaning an apartment and removing infested personal belongings is necessary to ensure the treatment's effectiveness. The district court found that the witnesses testified that with the proper preparation, the chemical-only treatment and the heat treatment are equally effective in eliminating bedbugs. The district court concluded that the HRA, upon notice of the presence of bedbugs in tenants' apartments, took steps to cure the defect in a reasonable amount of time by engaging the pest-control company to apply chemical-only treatments. *See, e.g.*, *Fritz*, 298 Minn. 54 at 55, 59, 213 N.W.2d at 340 (holding that tenant could raise as defense to unlawful-detainer action landlord's breach of covenant of habitability where landlord had notice of defects and requests for their correction but took no action); *Delamater*, 184 Minn. at 428-31, 239 N.W. at 148-49 (predicating civil liability on landlord's failure to take action after notice). The district court credited the testimony from the pest-control company witnesses, and we give the court's credibility determinations "due regard." Minn. R. Civ. P. 52.01.

---

[2] Tenants attempted to exterminate the bedbugs using 20 gallons of gasoline, but the bedbugs continued to exist in "large numbers" because they apparently were coming up through cracks in the floor. *Id.* at 429, 239 N.W. at 149. The court reasoned that the subpar condition of the apartment "d[id] not speak well for the landlord." *Id.*

The protections in section 504B.161 were devised to "assure adequate and tenantable housing within the state." *Meyer v. Parkin*, 350 N.W.2d 435, 438 (Minn. App. 1984) (quotation omitted), *review denied* (Minn. Sept. 12, 1984). However, the landlord's covenants to keep leased premises in reasonable repair and fit for intended use do not impose strict liability upon a landlord or expand the landlord's liability beyond that previously articulated in caselaw. *Id.* The district court correctly concluded that Minn. Stat. § 504B.161, subd. 1(a)(1), does not impose liability where the landlord cures or attempts to cure a defect within a reasonable time using an effective method of repair, even when the tenant prefers a different repair method or is inconvenienced by the chosen method. We therefore conclude that the district court properly determined that the HRA did not violate the covenant to keep the premises fit for their intended use.

Tenants also argue that the district court erred by declining to award rent abatement and other consequential damages. Because we determine that the HRA did not violate the covenants of habitability under Minnesota Statutes section 504B.161, subdivision 1(a), we do not reach tenants' argument that the district court erred by declining to award rent abatement or other consequential damages.

## D E C I S I O N

Because a landlord's duty under Minnesota Statutes section 504B.161, subdivision 1(a), to keep a residential premises in reasonable repair and fit for intended use does not extend to a tenant's personal property and because the statute does not require the landlord to provide the repair method of the tenant's choosing, where the method chosen by the

14

landlord is effective and offered within a reasonable time after notice of the defect, we affirm the district court's decision to deny tenants' rent-escrow claims.

**Affirmed.**