**Jan–Harlan KRISTIAN, petitioner,<br>Appellant,**

v.

**STATE of Minnesota, Department of<br>Corrections, et al., Respondents.**

No. C9–95–1202.

Court of Appeals of Minnesota.

Jan. 9, 1996.

Review Denied March 19, 1996.

Philip Marron, Minneapolis, for appellant.

Hubert H. Humphrey, III, Attorney General, James S. Alexander, Assistant Attorney General, St. Paul, for respondents.

Considered and decided by KALITOWSKI, P.J., and CRIPPEN and FOLEY, JJ.

## OPINION

FOLEY, Judge.*

Appellant Jan–Harlan Kristian, a prisoner of respondent State Department of Corrections, petitioned for an injunction prohibiting application of a new prison policy limiting his rights to possess property, arguing that the policy is unconstitutional on the grounds that it (1) denies his right of access to the courts, (2) unduly burdens his free speech rights, (3) is not reasonably related to legitimate penal interests, and (4) is arbitrary and capricious as written and employed. The district court granted summary judgment in favor of the Department of Corrections on all grounds. We affirm.

## FACTS

Kristian is currently incarcerated for third-degree murder. He began serving his sentence on February 24, 1981. On May 25, 1994, during a transfer from the Minnesota Correctional Facility-Lino Lakes to the Minnesota Correctional Facility–Faribault, Kristian became subject to the Allowable Property Policy (policy) promulgated by re-

---

\* Retired judge of the Minnesota Court of Appeals, serving by appointment pursuant to Minn. Const.

art. VI, § 2.

spondent State Department of Corrections (DOC).[1]

The policy limits the amount and type of property that adult male inmates may possess. All inmate property, with a few exceptions for large items such as televisions and fans, must fit within two footlockers kept in the cell. The footlockers are 32 inches long, 16 inches wide, and 12 inches tall. Any inmate property in excess of the two-footlocker limit must be shipped out of the institution.

Beginning March 1, 1994, all newly admitted inmates were subject to the policy. Although inmates incarcerated prior to that date were allowed to keep property already in their possession, the policy was to be applied whenever an inmate transferred facilities, and in any event all inmate property was to be in compliance with the policy by March 1, 1995.

The DOC cites fire hazards as a primary reason for the footlocker requirement. The fire marshall ordered that all inmate property within cells be kept in fire-resistant containers. The DOC asserts that, because of the limited space in each cell, there is no room for storage in excess of the two footlockers. The DOC also advances a security justification for the policy, stating that the more property an inmate has, the more potential places there are to hide contraband and the longer it takes staff to conduct adequate searches of the property.

Affidavits in the record indicate that there is limited space to store excess personal property elsewhere in the prison, as well as limited funds to maintain a staff to store, inventory, retrieve, and transport inmate property. At the Stillwater facility[2] alone, for example, there are 1,400 inmates, and in 1993, inmate property was required to be searched and packed up on at least 2,683 occasions.[3]

Kristian was told that he was being transferred from the Lino Lakes facility to the Faribault facility at about 12:15 a.m. on the day of the transfer. According to the DOC, this transfer was done on an expedited basis because of a confidential security concern posed by Kristian's presence at Lino Lakes. He was given two footlockers and told to pack his belongings. Among the items he selected were his legal materials, his diploma, his literary works written while incarcerated, and some personal hygiene items. However, at about 1:30 a.m., a corrections officer inspected his footlocker and told him that those items were not on the "Property List." Kristian objected and asked to speak to the officer in charge, who told him that items not on the Property List could not be included in his footlockers. DOC officials then packed up Kristian's footlockers with items of their choosing.

Pursuant to the policy, Kristian's remaining property was to be shipped out of the institution. Kristian asserts that the only person outside of prison that he is still in contact with is his 91–year–old grandmother, and that she has disposed of property sent to her in the past. She submitted an affidavit, though, indicating that she would store any of his excess property for him. Kristian seeks to have the DOC store within the prison any property that he may not retain in his cell.

The DOC now states that Kristian is entitled to possess the items mentioned above, indicating that the policy was not intended to be applied so strictly as to exclude obviously permissible items such as paper, and that the expedited basis of his transfer was part of the reason that it was misapplied.[4] Prison

---

1. Kristian has been transferred twice since that time and currently resides at the Minnesota Correctional Facility–Oak Park Heights.

2. At the time he filed this suit, Kristian was incarcerated at the Stillwater facility and thus the specific information in the record from the DOC tends to relate to that facility.

3. As an example of the problems posed by inmate property, the DOC notes that a search of Kris-

tian's own belongings, during a transfer after the one at issue here, required 24 hours of staff time and revealed a substantial amount of LSD hidden among his items.

4. In addition to an affidavit in the record from a DOC representative indicating that these items are allowed, the policy itself has been revised and the new version, which goes into effect January 1, 1996, permits them as "consumable items," provided that they fit within the footlocker limit.

officials have offered Kristian the opportunity to go through his belongings and select the items he wants. They contend, though, that whatever items he selects must fit within the two footlockers.

Kristian filed a pro se petition for injunction seeking to prohibit the DOC from disposing of his property. He challenges the policy on several grounds.

His first challenge is that the policy violates his constitutional right of access to the courts. This claim relates to a potential collateral attack on his conviction. In the summer of 1990, the court appointed attorney Jerod Peterson to represent Kristian in the appeal of an earlier postconviction petition. That appeal was withdrawn so that Peterson could attempt to locate witnesses "he believed were necessary to the successful prosecution of postconviction relief." This search continues today, and no action is pending. Kristian has apparently accumulated a great deal of legal materials related to his conviction. Although the record is not clear as to the amount or nature of these materials, they apparently include documents "unique" to his case, such as transcripts, briefs, and court orders. According to an affidavit by Peterson, Kristian has become a skilled "jailhouse lawyer" whose access to these documents is beneficial to the pursuit of his postconviction remedies. The DOC argues that in addition to Kristian's grandmother, Peterson, as his attorney, would be an appropriate person to retain these legal materials.

Kristian further asserts that the footlocker limitations, as applied to his various fiction and non-fiction literary works in progress, are an unconstitutional violation of his right to free speech. Kristian states that he intends to publish these ongoing projects after his scheduled release in November 1997. He claims that the limitation on the amount of this work that he may retain in prison violates his First Amendment rights.

Kristian also asserts that the policy is unconstitutional because it is not reasonably related to legitimate penal interests. He notes that he purchased all of his personal property while incarcerated and with the DOC's approval, and argues that, at the very least, it must store excess property for him rather than force him to send it into the community where he has no one he trusts with his belongings.

Finally, Kristian asserts that the policy is arbitrary and capricious as written and employed. He points to the fact that although the DOC now says that he may possess his legal documents, diploma, and personal hygiene items, it did not grant that permission until after Kristian filed this action, and at present, the Property List still does not on its face authorize those items.

The district court granted the DOC's motion for summary judgment on all of Kristian's claims. He now appeals to this court.

## ISSUES

I. Did the district court err in granting summary judgment to the DOC by holding that the policy does not violate Kristian's constitutional right of access to the courts?

II. Did the district court err in granting summary judgment to the DOC by holding that the policy does not violate Kristian's constitutional right to free speech?

III. Did the district court err in granting summary judgment to the DOC by holding that the policy is constitutional as reasonably related to legitimate penal interests?

IV. Did the district court err in granting summary judgment to the DOC by holding that the policy is not arbitrary and capricious as written or employed?

## ANALYSIS

This court must consider two questions on appeals from summary judgments:

(1) whether there are any genuine issues of material fact and (2) whether the lower courts erred in their application of the law.

*State by Cooper v. French,* 460 N.W.2d 2, 4 (Minn.1990). Appellate courts must view the evidence in the light most favorable to the non-moving party. *Fabio v. Bellomo,* 504 N.W.2d 758, 761 (Minn. 1993). We are not bound by and need not give deference to the trial court's decision on purely legal issues. *Frost–Benco Elec. Ass'n v. Minnesota Pub.*

*Utils. Comm'n,* 358 N.W.2d 639, 642 (Minn. 1984).

### I. Right of Access to the Courts

■ Prison inmates have a constitutional right of access to the courts that derives from the right to due process of law. *Bounds v. Smith,* 430 U.S. 817, 821, 97 S.Ct. 1491, 1494, 52 L.Ed.2d 72 (1977). This is a fundamental right because

> [a]ll other rights of an inmate are illusory without it, being entirely dependent for their existence on the whim or caprice of the prison warden.

*Adams v. Carlson,* 488 F.2d 619, 630 (7th Cir.1973).

■ Nonetheless, an inmate claiming a violation of the right of access "must make some showing of prejudice or actual injury" before relief may be granted. *McMaster v. Pung,* 984 F.2d 948, 953 (8th Cir.1993).[5] If the plaintiff does not demonstrate a "detrimental impact to his ability to present his legal papers to the court," the claim must fail. *Sammons v. Allenbrand,* 817 F.Supp. 94, 96 (D.Kan.1993). Kristian has failed to make such a showing in this case, and therefore his petition was properly dismissed by summary judgment.

Kristian fails to demonstrate how the policy limiting the number of legal materials he may retain at the prison has caused any prejudice or actual injury. A postconviction petition is at best only contemplated at present, while Kristian's attorney searches for witnesses related to a crime for which he was convicted over 14 years ago. Kristian's vague assertions about a need to access his materials are not supported by evidence that the policy has prevented him from filing documents or otherwise accessing the courts.

■ We also take particular note of the fact that Kristian is represented by court-appointed counsel. Prison administrators may exercise "wide discretion" in determining "the means and conditions of access to legal resources." *Glick v. Lockhart,* 769 F.2d 471, 472 (8th Cir.1985), *cert. denied,* 474 U.S. 997, 106 S.Ct. 414, 88 L.Ed.2d 364 (1985). Court-appointed representation is "a constitutionally permissible means of access," and when provided, an inmate may not reject it in favor of another means. *United States v. Wilson,* 690 F.2d 1267, 1271 (9th Cir.1982), *cert. denied,* 464 U.S. 867, 104 S.Ct. 205, 78 L.Ed.2d 178 (1983); *see also Sammons,* 817 F.Supp. at 95 ("Where an inmate enjoys legal representation, the government's obligation to provide meaningful access to the courts is satisfied."). Although Peterson indicated by affidavit that it would be more convenient if Kristian were allowed to possess his legal documents, that is insufficient to demonstrate that the policy has caused any actual prejudice. Indeed, as an officer of the court, it is Peterson's responsibility to assist Kristian in selecting those materials that would be useful to possess in prison and that will fit in the footlockers, and to retain any excess materials that are relevant to the contemplated litigation.

### II. Free Speech

■ Kristian contends that the district court erred in granting summary judgment to the DOC on his free speech claim, which concerns his right to either possess or have the DOC store his voluminous literary works.

The policy in this case simply does not affect Kristian's First Amendment rights. The policy's only effect on his writings is a limitation on the amount that he may possess in his cell; it does not affect what ideas he may express, nor what papers he may send or receive. Therefore, the policy does not implicate his right to free speech. *Cf. Sands v. Lewis,* 886 F.2d 1166, 1172 (9th Cir.1989) (prison regulation prohibiting typewriter in cell does not impinge upon inmate's free speech rights). Summary judgment was appropriately granted on this claim.

### III. Reasonable Relationship to Legitimate Penal Interests

■ A prison regulation that burdens an inmate's constitutional rights is only "val-

---

5. An exception to this rule applies when the regulation is a "systematic denial" of the right of access constituting such a "fundamental deprivation that it is an injury in itself." *Blaise v. Fenn,* 48 F.3d 337, 340 (8th Cir.1995) (quoting *Hersh-berger v. Scaletta,* 33 F.3d 955, 956 (8th Cir. 1994)). The policy in this case, though, does not rise to that level of systematic deprivation, and therefore we apply the normal requirement that Kristian show prejudice or actual injury.

id if it is reasonably related to legitimate penological interests." *Turner v. Safley,* 482 U.S. 78, 89, 107 S.Ct. 2254, 2261, 96 L.Ed.2d 64 (1987). The Supreme Court in *Turner* listed four factors relevant to this determination. *Id.* at 89–91, 107 S.Ct. at 2262. First, there must be a " 'valid, rational connection' between the prison regulation and the legitimate governmental interest put forward to justify it." *Id.* at 89–90, 107 S.Ct. at 2262 (quoting *Block v. Rutherford,* 468 U.S. 576, 586, 104 S.Ct. 3227, 3232, 82 L.Ed.2d 438 (1984)). Second, the court must consider "whether there are alternative means of exercising the right that remain open to prison inmates," giving deference to the judgment of correction officials. *Id.* at 90, 107 S.Ct. at 2262. Third, the court must evaluate how accommodation of the right will impact guards, inmates, and resources at the prison, again giving deference to correction officials. *Id.* Finally, the court must determine whether "ready alternatives" exist or whether the regulation is instead an "exaggerated response" to prison concerns. *Id.* at 90–91, 107 S.Ct. at 2262. The deference given to prison officials "is at its height when the prison regulations at issue involve security and safety concerns." *Savko v. Rollins,* 749 F.Supp. 1403, 1406 (D.Md.1990) (citing *Bell v. Wolfish,* 441 U.S. 520, 547, 99 S.Ct. 1861, 1878, 60 L.Ed.2d 447 (1979)), *aff'd sub nom. Simmons v. Rollins,* 924 F.2d 1053 (4th Cir. 1991).

There can be no doubt that a valid, rational connection exists in the present case between the policy and a legitimate governmental interest. The policy is a response to serious fire safety and prison security concerns that are supported by the record. The limits on both the amounts and types of items that may be possessed within the cell address those concerns in a reasonable manner.

Although he may not have alternative means of possessing his property within the prison, Kristian does appear to have the option of sending his excess property to his grandmother. He asserts that he is unsatisfied with that option, but his grandmother submitted an affidavit indicating that she would safeguard his property for him.

In any event, even if we were to assume that Kristian's excess property will be forfeited as a result of the policy, consideration of the impact of storing it in prison leads us to conclude that the policy must still be upheld. The search of Kristian's own property that took place shortly after the incident giving rise to this suit demonstrates the problems faced by the DOC in dealing with large amounts of inmate property: the search took 24 hours of staff time and revealed substantial amounts of illegal drugs. The number of prisoners at each facility, as well as the even greater number of searches that are already required each time inmate property must be packed up, indicates that the staff and financial resources would be overwhelmed if inmates were permitted to accumulate and store the amounts of property Kristian now possesses. The limitations here are simply a management decision. Because the DOC's considerations in making the decision relate to safety and security, our deference to its resolution of the problem is "at its height." *Savko,* 749 F.Supp. at 1406. Under the circumstances, we find the policy to be reasonable.

Finally, no "ready alternatives" exist to accommodate Kristian's asserted interest. The fire marshall instructed the DOC to require that all property be maintained in fireproof containers. Again, we must defer to the DOC's judgment that the size of the cells will not safely or securely permit more than two footlockers. Also, we simply cannot require the DOC to enter the costly and resource-draining business of warehousing excess property for the substantial numbers of inmates who are incarcerated in our prisons.

### IV. Arbitrary and Capricious

Kristian argues that the policy is arbitrary and capricious on its face and as it was originally applied to him because it appears to exclude papers, personal hygiene items, and a host of other things that prisoners can buy in the prison canteen.

As noted before, the DOC has since clarified that the items above are permitted within the cells, and the new version of the policy, that takes effect on January 1, 1996, apparently reflects the clarification. The DOC has

offered to permit Kristian access to all his belongings so that he can select the items he wishes to retain in his footlockers. The policy was misapplied during the transfer at issue. However, the record indicates that Kristian's property had to be gathered in the middle of the night because he was being moved for confidential security reasons on an expedited basis. Because of the clarification and the circumstances in this case, we do not find the policy arbitrary and capricious either as written or applied.

Concluding and to reiterate, efficient and effective management of Minnesota prisons mandates that reasonable latitude be given to the DOC and those in charge of the particular institution to ensure that fire safety and security requirements of the inmates (1400 at Stillwater alone) be met. In the pursuit of those penal-related goals, it is likewise *constitutionally* required that inmates' due process right of access to the courts be fully protected. However, this right does not require that the management of inmates' matters or prison regulations be so designed as to meet the *personal* desires or demands requested of a particular inmate where the inmate's right of access has been provided. *Wilson,* 690 F.2d at 1271.

On a careful analysis of the total circumstances that bear on the question of right of access to the court in this case, including right to counsel, access to law library facilities at Stillwater prison, and possession and preservation of essential legal materials, all provided to and for the inmate, we find the constitutional rights of Kristian fully protected and the action of the DOC reasonable.

We further find that Kristian has failed to show any prejudice to his rights by any action of the DOC in the institution. *See McMaster,* 984 F.2d at 953 (to state claim, inmate must make some showing of prejudice or actual injury resulting from prison official's conduct).

A careful review of the record reflects no violation of any of Kristian's First Amendment rights.

## DECISION

The district court properly concluded that the policy in this case is constitutional. Kristian failed to demonstrate any actual prejudice or injury with respect to his claim that the policy denies his right of access to the courts. The policy does not implicate the right of free speech guaranteed by the First Amendment. The justifications for the policy advanced by the DOC demonstrates that it is rationally related to legitimate penal interests. Considering the subsequent clarifications of the policy and the circumstances surrounding its initial application to Kristian, it is not arbitrary or capricious as written or as it was applied. Summary judgment was properly granted on all grounds.

**Affirmed.**