Alphonso **MITCHELL**, Appellant,

v.

Michelle **SMITH**, Warden Minnesota Correctional Facility–Stillwater, Respondent.

No. A12–0077.

Court of Appeals of Minnesota.

July 30, 2012.

Bradford Colbert, Legal Assistance to Minnesota Prisoners, Paul Ziezulewicz, Certified Student Attorney, St. Paul, MN, for appellant.

Lori Swanson, Attorney General, Gina D. Jensen, Assistant Attorney General, St. Paul, MN, for respondent.

Considered and decided by ROSS, Presiding Judge; WRIGHT, Judge; and MUEHLBERG, Judge.*

## OPINION

WRIGHT, Judge.

Appellant, a prison inmate and convicted sex offender, challenges the Minnesota Department of Corrections policy that pre-cludes appellant from visiting with his minor child while incarcerated. He asserts that the policy deprives him of a substantive-due-process right to parent his minor daughter. The district court granted summary judgment for respondent prison warden, and we affirm.

## FACTS

Appellant Alphonso Mitchell pleaded guilty in 2003 to third-degree criminal sexual conduct for engaging in sexual relations with a 15–year–old girl when he was 29 years old. Mitchell's daughter was born on November 11, 2002, as a result of this sexual relationship. The district court sentenced Mitchell to 36 months' imprisonment, and Mitchell was placed on supervised release in August 2005.

In March 2006, Mitchell was arrested for failing to register as a sex offender. During police questioning, he admitted that he had recently kissed a 16–year–old girl. Because of his sexual contact with a minor and because he neglected to complete sex-offender treatment, a condition of his release, Mitchell's supervised release was revoked and he was ordered to serve 150 days in custody.

In August 2006, Mitchell again was placed on supervised release. He subsequently pleaded guilty to charges in two separate criminal complaints. A July 2006 complaint alleged that, between December 2005 and March 2006, Mitchell and his codefendant kidnapped two minor females and held them at a St. Paul residence, where the minors were drugged, physically assaulted, sexually assaulted, and forced to engage in prostitution. The complaint also alleged that Mitchell committed arson. Mitchell was charged with soliciting and promoting prostitution of minors, kidnap-

---

* Retired judge of the district court, serving as judge of the Minnesota Court of Appeals by appointment pursuant to Minn. Const. art. VI, § 10.

ping, arson, and first-degree criminal sexual conduct. On March 12, 2007, Mitchell pleaded guilty to one count of aiding and abetting solicitation and promotion of prostitution of a minor, a violation of Minn. Stat. §§ 609.05, subd. 1, 609.322, subd. 1(1)-(2) (2006), and one count of first-degree arson, a violation of Minn.Stat. § 609.561, subd. 1 (2006). Based on a separate incident, Mitchell also pleaded guilty to solicitation of a minor to practice prostitution, a violation of Minn.Stat. § 609.322, subd. 1(1). The district court imposed multiple concurrent sentences, the longest of which is 192 months' imprisonment. Mitchell began serving his sentences in May 2007 at the Minnesota Correctional Facility at St. Cloud (MCF–SCL).

The Department of Corrections (department) generally provides visiting privileges to incarcerated offenders in an effort to allow offenders to maintain family and community relationships. But the department restricts visiting privileges for offenders who have documented abuse history involving minors. Offenders with a documented sexual- or physical-abuse history involving minors are assigned an abuse category code at intake. The abuse codes include: "CS" (close supervision with all minors), "NC" (no physical contact with minors), and "NV" (no visiting privileges with minors as specified by the department). Close-supervision visits allow an offender to have visitation rights in an assigned seating arrangement that allows staff to closely observe the visit. Non-contact visits allow an offender to be seated at a desk across from a minor visitor who is separated by a glass barrier. An offender can view the visitor through the glass and speak to the visitor through a two-way telephone communication system. The conversations are recorded, but department staff members typically do not listen to the conversations during the vis-

its. A correctional officer is stationed immediately outside the non-contact visiting area and can view the area through glass. But direct supervision is limited. No-visiting privileges restrict an offender from any visitation with minors as directed by the department. When deciding which abuse code to assign to an offender, prison officials review the offender's disciplinary and criminal history and any programming and treatment the offender has completed. Sex-offender inmates may obtain visiting privileges after successfully completing sex-offender treatment, based on the recommendation of treatment professionals.

When he was admitted to MCF–SCL, Mitchell was assigned an abuse code of "NC," which permitted him to have in-person visitation but prohibited physical contact with minor visitors. On June 12, 2007, Mitchell was transferred to the Minnesota Correctional Facility at Stillwater (MCF–STW), where he has since been incarcerated. After his transfer to MCF–STW, Mitchell appealed his "NC" abuse code. After considering Mitchell's multiple sexual offenses involving minors, violations of supervised-release requirements by sexual or grooming behaviors with minors, and current incarceration for sexual offenses involving minors that occurred while he was on supervised release, prison officials determined that Mitchell should have been assigned a code of "NV" based on the department's Abuse Offender Categorizing Form. This form states: "No minor (under 18) visits will be allowed to an offender ... who was previously convicted of a sexual offense or one with sexual characteristics involving a minor, and subsequently violated release expectations. These offenders must repeat their participation in Sex Offender Treatment." Prison officials amended Mitchell's abuse code to "NV." Mitchell unsuccessfully appealed his NV abuse code in 2010 and in 2011.

In February 2011, Mitchell sued respondent warden of MCF–STW,[1] alleging that the warden violated Mitchell's fundamental right to substantive due process under the United States Constitution and the Minnesota Constitution by denying him visitation with his minor daughter. Mitchell sought injunctive and declaratory relief permitting him contact visitation with his daughter. Both parties moved for summary judgment. Mitchell sought relief in the form of in-person visitation without physical contact with minor visitors—a visitation code of "NC." Following a hearing, the district court rejected Mitchell's constitutional claims and granted summary judgment for the prison warden. This appeal followed.

## ISSUE

Does the prison visitation policy violate appellant's substantive-due-process rights?

## ANALYSIS

We review the district court's decision to grant summary judgment to determine whether there are any genuine issues of material fact and whether the district court erred in its application of the law. *State by Cooper v. French,* 460 N.W.2d 2, 4 (Minn.1990). In doing so, we view the evidence in the light most favorable to the party against whom summary judgment was granted. *Fabio v. Bellomo,* 504 N.W.2d 758, 761 (Minn.1993). Summary judgment shall be granted if the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that either party is entitled to a judgment as a matter of law." Minn. R. Civ. P. 56.03.

■ Mitchell asserts that the prison-visitation policy that restricts him from visiting with his minor daughter violates his constitutional right to substantive due process by prohibiting him from exercising his constitutionally protected parental rights. The United States Constitution and the Minnesota Constitution provide that the government cannot deprive a person of "life, liberty, or property, without due process of law." U.S. Const. XIV, § 1; *accord* Minn. Const. art. I, § 7. We review Mitchell's challenge under both federal and state precedent because the due-process protections of the United States Constitution and the Minnesota Constitution are coextensive. *Sartori v. Harnischfeger Corp.,* 432 N.W.2d 448, 453 (Minn.1988).

■ "[S]ubstantive due process protects individuals from 'certain arbitrary, wrongful government actions regardless of the fairness of the procedures used to implement them.'" *In re Linehan,* 594 N.W.2d 867, 872 (Minn.1999) (quoting *Zinermon v. Burch,* 494 U.S. 113, 125, 110 S.Ct. 975, 983, 108 L.Ed.2d 100 (1990)). The Due Process Clause "provides heightened protection against government interference with certain fundamental rights and liberty interests." *Washington v. Glucksberg,* 521 U.S. 702, 720, 117 S.Ct. 2258, 2267, 138 L.Ed.2d 772 (1997). The protection of the Due Process Clause includes the freedoms protected by the Bill of Rights and those fundamental rights and liberties that are "deeply rooted in this Nation's history and tradition," such as the right to "direct the education and upbringing of one's children." *Id.* at 720–

---

1. The original complaint named John King, who was the warden of MCF–STW when Mitchell's action commenced, in his official and individual capacities. In September 2011, Mitchell amended the complaint to substitute the current warden, respondent Michelle Smith, in her official capacity only, for the claims asserted against the former warden.

21, 117 S.Ct. at 2267–68 (quotation omitted).

■ · Among the fundamental rights protected by the Due Process Clause is the liberty interest of parents in the care, custody, and control of their children. *Troxel v. Granville*, 530 U.S. 57, 66, 120 S.Ct. 2054, 2060, 147 L.Ed.2d 49 (2000); *SooHoo v. Johnson*, 731 N.W.2d 815, 820 (Minn. 2007). "[T]he custody, care and nurture of the child reside first in the parents, whose primary function and freedom include preparation for obligations the state can neither supply nor hinder." *Troxel*, 530 U.S. at 65–66, 120 S.Ct. at 2060; *see also SooHoo*, 731 N.W.2d at 820 (acknowledging "protected fundamental right" of parent to make decisions about child). These parental rights include the right to direct the education and upbringing of one's child, *Pierce v. Soc'y of Sisters*, 268 U.S. 510, 534–35, 45 S.Ct. 571, 573, 69 L.Ed. 1070 (1925); to conceive and raise one's child, *Stanley v. Illinois*, 405 U.S. 645, 651, 92 S.Ct. 1208, 1212, 31 L.Ed.2d 551 (1972); to direct the religious upbringing of one's child, *Wisconsin v. Yoder*, 406 U.S. 205, 213–14, 92 S.Ct. 1526, 1532, 32 L.Ed.2d 15 (1972); and to make decisions regarding the care, custody, and control of one's child, *Troxel*, 530 U.S. at 66, 120 S.Ct. at 2060. Above all, constitutionally protected parental rights encompass the relationship between parent and child. *See Quilloin v. Walcott*, 434 U.S. 246, 255, 98 S.Ct. 549, 555, 54 L.Ed.2d 511 (1978) (observing that substantive due-process rights of parent "would be offended if a State were to attempt to force the breakup of a natural family, over the objections of the parents and their children, without some showing of unfitness" (quotation omitted)); *Stanley*, 405 U.S. at 651, 92 S.Ct. at 1212 (recognizing protection afforded a parent's private interest in his or her children, including "the interest of a parent in the companionship, care, custody, and management of his or her children"); *In re Scott Cnty. Master Docket*, 672 F.Supp. 1152, 1165 (D.Minn.1987) (recognizing the protected constitutional interest "in the development of parental and filial bonds free from government interference ... manifested in the reciprocal rights of parent and child to one another's companionship" (quotation omitted)), *aff'd sub nom. Myers v. Scott Cnty.*, 868 F.2d 1017 (8th Cir.1989).

■ This case requires us to examine the rights of an incarcerated parent. Prisoners do not forfeit all constitutional rights while incarcerated. *See Turner v. Safley*, 482 U.S. 78, 84, 107 S.Ct. 2254, 2259, 96 L.Ed.2d 64 (1987) ("Prison walls do not form a barrier separating prison inmates from the protections of the Constitution."). When a prison regulation offends a fundamental constitutional guarantee, courts must discharge their duty to vindicate an inmate's constitutional rights. *Procunier v. Martinez*, 416 U.S. 396, 405–06, 94 S.Ct. 1800, 1807–08, 40 L.Ed.2d 224 (1974), *limited by Thornburgh v. Abbott*, 490 U.S. 401, 413, 109 S.Ct. 1874, 1881, 104 L.Ed.2d 459 (1989). But courts have long recognized that incarceration necessarily limits a prisoner's privileges and liberties. *See Overton v. Bazzetta*, 539 U.S. 126, 131, 123 S.Ct. 2162, 2167, 156 L.Ed.2d 162 (2003) ("The very object of imprisonment is confinement. Many of the liberties and privileges enjoyed by other citizens must be surrendered by the prisoner."); *Jones v. North Carolina Prisoners' Labor Union, Inc.*, 433 U.S. 119, 125, 97 S.Ct. 2532, 2537, 53 L.Ed.2d 629 (1977) ("[L]awful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a reaction justified by the considerations underlying our penal system." (quotation omitted)). "An inmate does not retain rights inconsistent with

proper incarceration." *Overton,* 539 U.S. at 131, 123 S.Ct. at 2167.

Like other fundamental rights and liberties, parental rights are subject to substantial restrictions as a result of incarceration. *Id.; see also SooHoo,* 731 N.W.2d at 822 (recognizing that states may intrude on parental rights to protect children's well-being). For example, prisoners do not have an unconditional constitutional right to visit with family members. *See Overton,* 539 U.S. at 131–33, 123 S.Ct. at 2167–68 (holding that prison regulations restricting prisoners from visitation with family members, including minors, do not violate substantive due-process or free-association guarantees of First Amendment); *Bellamy v. Bradley,* 729 F.2d 416, 420 (6th Cir.1984) (holding that prisoner does not have an absolute constitutional right to visitation and limitations may be placed on visitation if necessary to meet penological objectives).

Because prisons "are peculiarly within the province of the legislative and executive branches of government," courts accord deference to prison authorities. *Turner,* 482 U.S. at 84–85, 107 S.Ct. at 2259. This deference is highest when the prison regulation at issue involves security and safety. *Kristian v. State,* 541 N.W.2d 623, 629 (Minn.App.1996), *review denied* (Minn. Mar. 19, 1996). Accordingly, inmates retain those constitutional rights that are not inconsistent with their status as prisoners or with the legitimate penological objectives of the corrections system. *Turner,* 482 U.S. at 89, 107 S.Ct. at 2261–62; *State v. Cuypers,* 481 N.W.2d 553, 556 (Minn.1992).

Mitchell maintains that the proper legal standard for his substantive-due-process claim is set forth in *Martinez,* where the interests of prisoners and nonprisoners were "inextricably meshed." 416 U.S. at 408–09, 94 S.Ct. at 1808–09. In *Martinez,* the United States Supreme Court invalidated a prison regulation that censored the prisoners' mail because the restriction of the prisoners' rights to communicate with nonprisoners consequentially restricted the First Amendment and Fourteenth Amendment rights of those who are not prisoners. *Id.* at 408–09, 415, 94 S.Ct. at 1809, 1812. The *Martinez* Court adopted a standard of review for prisoner-mail censorship that requires the regulation to (1) further a substantial or important interest unrelated to the suppression of speech and (2) impose a limitation that is no greater than necessary to further that interest. *Id.* at 413, 94 S.Ct. at 1811. Mitchell contends that the more stringent legal standard applied in *Martinez* is appropriate here because his parental rights are "inextricably meshed" with the parental rights of his daughter's mother and the right of his daughter to be parented, such that any restriction on his rights consequentially restricts their rights. We disagree.

Our research identifies only one case in which the United States Supreme Court has applied the *Martinez* standard to evaluate a challenged prison regulation—*Martinez* itself. The *Turner* Court expressly declined to apply the *Martinez* standard and established a less strict reasonable-relationship standard. *Turner,* 482 U.S. at 87–89, 107 S.Ct. at 2261. The United States Supreme Court subsequently has limited the application of *Martinez* to First Amendment claims regarding prison regulations of outgoing correspondence, *Thornburgh,* 490 U.S. at 413, 109 S.Ct. at 1881, and clarified that the reasonableness standard set forth in *Turner* "applies to all circumstances in which the needs of prison administration implicate constitutional rights," *Washington v. Harper,* 494 U.S. 210, 224, 110 S.Ct. 1028, 1038, 108 L.Ed.2d 178 (1990); *see also Thornburgh,* 490 U.S.

at 409–10, 109 S.Ct. at 1879–80 (stating that *Turner* establishes that the strict *Martinez* standard is "not appropriate for consideration of regulations that are centrally concerned with the maintenance of order and security within prisons"). Thus, the *Turner* standard applies here.

■■■■■ To ensure appropriate deference to prison officials, a prison regulation alleged to infringe an inmate's constitutional rights is valid only if the regulation is reasonably related to legitimate penological interests. *Turner*, 482 U.S. at 89, 107 S.Ct. at 2261. When determining whether a prison regulation is reasonable, we consider several relevant factors: (1) whether the regulation is rationally related to a legitimate and neutral government objective; (2) whether alternative means of exercising the asserted right remain open to prison inmates; (3) the impact of accommodating the asserted constitutional right on prison officers, inmates, and resources; and (4) whether alternatives to the regulation are readily available. *Id.* at 89–90, 107 S.Ct. at 2262; *Kristian*, 541 N.W.2d at 629. The inmate challenging a prison regulation bears the burden of demonstrating that the regulation is invalid. *Overton*, 539 U.S. at 132, 123 S.Ct. at 2168.

■■■■ Here, Mitchell contends that the prison-visitation policy infringes his substantive-due-process right to parent his daughter through in-person, non-contact visits. He asserts that the policy prevents him from developing a meaningful parental relationship with his daughter by seeing her and being physically present in her life. We observe that many aspects of parenting remain available to Mitchell under prison regulations. For example, he can make decisions concerning his daughter's upbringing and education and communicate those decisions directly to her caregivers through in-person visits, telephone conversations, and written commu-

nications. He also can maintain a relationship with his daughter and provide his guidance and support to her directly through telephone and written communications.

■■■■ Nonetheless, the prison-visitation policy restricts certain parental rights by preventing Mitchell from enjoying his daughter's in-person companionship and by limiting Mitchell's means to direct his daughter's care, custody, and control. Because the prison-visitation policy infringes these aspects of Mitchell's parental rights, we consider whether the policy is reasonably related to legitimate penological interests. *See Turner*, 482 U.S. at 89, 107 S.Ct. at 2261. A prison regulation is not rationally related to a neutral, legitimate government objective if the connection between the objective and the regulation is "so remote as to render the policy arbitrary or irrational." *Id.* at 89–90, 107 S.Ct. at 2262. Here, affidavits from prison officials establish that one objective of the challenged policy is to protect minor visitors from being subjected to sexual, physical, visual, or verbal abuse, intimidation, and grooming behaviors used to manipulate females into prostitution. The affidavits also explain that restricting a sex-offender inmate from visiting with minors—particularly when the inmate has not completed sex-offender treatment—avoids situations that may cause the inmate to become inappropriately sexually aroused. The record demonstrates that the prison's visitation policy exists to promote legitimate penological goals, namely, to protect the safety, health, and welfare of minor visitors and to rehabilitate sex-offender inmates. *See Overton*, 539 U.S. at 133, 123 S.Ct. at 2168 (stating that promoting internal security and protecting children from harm are legitimate penological goals); *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 348, 107 S.Ct. 2400, 2404, 96 L.Ed.2d 282 (1987)

(recognizing rehabilitation of prisoners and institutional security as valid penological objectives).

The rational connection between these legitimate concerns and the challenged policy is demonstrated by prison officials' affidavits explaining that restricting sex-offender inmates from visiting with minors reduces or eliminates the opportunity for a sex-offender inmate to behave in an abusive or exploitive manner with minor visitors. This policy protects minor visitors from exposure to emotional abuse or sexually exploitive behavior. The policy promotes rehabilitative efforts by allowing minor-visiting privileges only for sex-offender inmates who successfully complete sex-offender treatment. Moreover, the policy is narrowly designed to accomplish these objectives because it does not establish a permanent, absolute prohibition on an inmate's visitation with minor children. The policy affords sex-offender inmates the possibility of obtaining visitation privileges by completing treatment, which Mitchell has failed to do despite receiving three directives to do so. Accordingly, the challenged policy bears a rational relationship to legitimate penological interests.

We next consider whether inmates have alternative means to exercise the asserted constitutional right. *Turner*, 482 U.S. at 90, 107 S.Ct. at 2262. The record demonstrates that an inmate in Mitchell's position has alternative means available to maintain a meaningful relationship with his minor child while incarcerated. Prison regulations permit inmates "reasonable and equitable access to telephones." And inmates may send and receive written correspondence. We reject Mitchell's contention that written and telephone communications are inadequate because his daughter has limited reading ability and he has limited access to a telephone while incarcerated. Although the record

demonstrates that prison authorities have previously restricted Mitchell's ability to communicate with specific individuals, the record does not reflect that Mitchell is restricted from writing to or speaking by telephone with his daughter, her mother, or his daughter's other caregivers. Written and telephone communication are reasonable alternatives to visitation in these circumstances. *See Overton*, 539 U.S. at 135, 123 S.Ct. at 2169 (holding that written and telephone communication are adequate alternatives to visitation for young children and illiterate inmates). Moreover, the prison-visitation policy permits sex-offender inmates to visit with adults, allowing an inmate and adult visitors to communicate in person about a minor's upbringing. Alternatives to visitation need not be ideal, as long as reasonable alternatives are available. *Id.* Because prison regulations permit Mitchell to communicate with his daughter, her mother, and her caregivers, Mitchell has reasonable alternatives to visitation that permit him to maintain a meaningful relationship with his daughter.

We also consider the impact that accommodating the asserted constitutional right would have on guards, inmates, and prison resources. *Turner*, 482 U.S. at 90, 107 S.Ct. at 2262. We are particularly deferential to prison officials' regulatory judgment when security is implicated and financial resources are affected. *Id.; Overton*, 539 U.S. at 135, 123 S.Ct. at 2169. Affidavits from prison officials establish that monitoring visits between minors and sex-offender inmates who have not received treatment would require a significant reallocation of the prison system's financial resources and security personnel. Additionally, the record demonstrates that assessing and treating the risk a sex-offender inmate poses to a minor visitor outside of established sex-offender-treatment programs would require

financial and personnel resources that the prison lacks. The prison's visitation policy offers an incentive for participating in the established sex-offender-treatment program by providing the possibility of visiting privileges with minors for sex-offender inmates who satisfactorily complete sex-offender treatment. Permitting sex-offender inmates to visit with minors before completing treatment would create a disincentive for inmates to participate in sex-offender treatment and rehabilitation. We defer to the judgment of prison officials that prison resources cannot accommodate safe visits between minors and untreated sex-offender inmates.

Finally, we consider whether there is a readily available alternative to the policy. *Turner*, 482 U.S. at 90, 107 S.Ct. at 2262. The absence of readily available alternatives is evidence of the reasonableness of a prison policy, but this is not a "least restrictive alternative" test. *Id.* Instead, we consider whether the challenged policy is reasonable or is an "exaggerated response" to the prison's rehabilitation and safety concerns. *Id.* A readily available alternative is a method that fully accommodates the asserted right while imposing no more than a de minimis cost. *Id.* at 91, 107 S.Ct. at 2262; *Overton*, 539 U.S. at 136, 123 S.Ct. at 2169 (evaluating "whether the prisoner has pointed to some obvious regulatory alternative"). We evaluate any proposed alternative with the understanding that maintaining prison security is "central to all other corrections goals." *Pell v. Procunier*, 417 U.S. 817, 823, 94 S.Ct. 2800, 2804, 41 L.Ed.2d 495 (1974).

We reject Mitchell's assertion that his rights can be accommodated by permitting inmates with visiting restrictions to visit with their own minor children but not with other minors. An untreated sex-offender inmate poses the same risk of harm to his own minor children as he does to other minors; and we defer to prison officials' judgment that visits between a sex-offender inmate and any minor require monitoring and risk-assessment at some cost to prison resources. Our review of the record does not establish, and Mitchell does not identify, any evidence of the number of inmates this alternative would impact or the degree to which the alternative would burden prison staff and resources. But we are mindful that any accommodation of Mitchell's asserted rights must be provided to all similarly situated inmates, and Mitchell has not identified a viable alternative to the prison's visitation policy that undermines the reasonableness of the policy. In light of the reasonable deference we afford prison officials' regulatory judgment when financial resources are affected, we conclude that the required allocation of resources would impose more than a de minimus cost.

The challenged prison visitation policy is reasonably related to and advances the valuable corrections goals of child safety and security and sex-offender treatment and rehabilitation. The record establishes that the risk of harm to children is high and the alternatives are costly. The policy denies visitation privileges only to those who pose a particular risk of harm based on the inmate's particular offenses, and the policy permits sex-offender inmates to obtain visitation privileges by successfully completing treatment. Because the policy is reasonably related to the prison's legitimate penological interests, the policy is constitutionally valid. Accordingly, the district court properly granted summary judgment in favor of the prison warden.

## DECISION

Because the challenged prison-visitation policy is reasonably related to legitimate

penological interests and advances those interests, the policy does not violate appellant's substantive-due-process rights to parent his minor daughter. Summary judgment was properly granted in favor of respondent.

**Affirmed.**